IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DEBORAH PRISE and HEATHER RADY,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **Civil Action No. 06-1470** |
| | ) | |
| **ALDERWOODS GROUP, INC., BURTON L. HIRSCH FUNERAL HOME, INC., H.P. BRANDT FUNERAL HOME, INC., and H. SAMSON, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Conti, District Judge

### *Introduction*

This case involves two former funeral home employees, plaintiffs Deborah Prise ("Prise") and Heather Rady ("Rady," and together with Prise "plaintiffs"), who allege that their employers, defendants Alderwoods Group, Inc. ("Alderwoods"), Burton L. Hirsch Funeral Home, Inc. ("Hirsch Funeral Home"), H.P. Brandt Funeral Home, Inc. ("Brandt Funeral Home") and H. Samson, Inc. ("Samson Funeral Home" and together with Alderwoods, Hirsch Funeral Home and Brandt Funeral Home, "defendants"), subjected them to various forms of illegal discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") and the Equal Pay Act, 29 U.S.C. §206(d) ("Equal Pay Act"). Pending before the court are motions for summary judgment filed by defendants and a motion for partial summary judgment filed by Prise.

*Background*

A.    **Prise**

Approximately six decades ago, Burton L. Hirsch ("Mr. Hirsch") established Hirsch

Funeral Home in the Pittsburgh, Pennsylvania, community of Squirrel Hill, a predominantly

Jewish neighborhood.  (Joint Statement of Facts Relative to Defs.' Mot. for Sum. J. as to the

Claims of Pl. Deborah Prise ("J.S.-Prise") ¶ 1.) (Doc. No. 157.)  In 1996, Mr. Hirsch sold Hirsch

Funeral Home to the entity that would later become Alderwoods.  (*Id.* ¶ 3.)  Between 2002 and

2006, Alderwoods was a corporation engaged in the business of providing mortuary services.

*(Id.* ¶ 4.)  Alderwoods operated funeral homes and cemeteries across North America, among

which were Hirsch Funeral Home, Brandt Funeral Home and Samson Funeral Home.  (Joint

Statement of Facts Relative to Defs." Mot. For Sum. J. as to the Claims of Pl. Heather Rady

("J.S.-Rady") ¶ 1.)  (Doc. No. 158.)  These three funeral homes were all located in the Pittsburgh,

Pennsylvania area.  (*Id.*)  Alderwoods maintained an antidiscrimination policy designed to ensure

that its services were available to all deceased customers, without regard to gender, race or

religion.  (J.S.-Prise ¶ 5.)

In September 2002, Prise, who is Jewish, enrolled at the Pittsburgh Institute for Mortuary

Science ("PIMS").  (*Id.* ¶ 8.)  She applied for a student-level position at Alderwoods in October

2002.  (*Id.*)  Two months later, in December 2002, Alderwoods hired Prise for a part-time

position at Hirsch Funeral Home.  (*Id.* ¶ 9.)  She earned $5.15 per hour.  (*Id.*)

Prise received her funeral director's license from the Commonwealth of Pennsylvania on

November 12, 2004.  (*Id.* ¶ 10.)  Nine days later, Alderwoods promoted her to the position of

funeral director.  (*Id.*)  In that capacity, she earned $18.00 per hour.  (*Id.*)  She reported to Michael Hilgefort ("Hilgefort"), who was the location manager at Hirsch Funeral Home.  (*Id.*)

Shortly thereafter, Hilgefort expressed his intention to resign as the location manager in order to become a full-time funeral director. (*Id.* ¶ 14.)  Pat McDermott ("McDermott"), the general manager for Alderwoods' Pittsburgh market, suggested to recruiter Larry Newsom ("Newsom") that Prise be considered as a possible replacement for Hilgefort.  (*Id.*)  Prise applied to succeed Hilgefort as the location manager at Hirsch Funeral Home.  (*Id.* ¶ 16.)  Alderwoods typically required its location managers to have anywhere from three to five years of experience in the position of funeral director.  (*Id.* ¶ 17.)  Nevertheless, Prise was promoted to be Hirsch Funeral Home's location manager in May 2005, at which point she had only seven months of experience as a funeral director.  (*Id.*)  After her promotion, Prise's annual salary was $50,000.00.  (*Id.* ¶ 18.)  Hilgefort's starting salary had been $48,000.00 per year.  (*Id.*)  Hilgefort had roughly five years of experience as a funeral director when he became a  location manager. (*Id.*)  His salary was increased to $50,000.00 per year after the conclusion of a three-month probationary period.  (*Id.*)  Prise was apparently never subject to such a probationary period. (*Id.*)  Because Hirsch Funeral Home was located in Squirrel Hill, Alderwoods attempted to make it attractive to Jewish families.  (*Id.* ¶ 21.)  Particular Jewish congregations were offered special pricing packages.  (*Id.*)

During this same period of time, Alderwoods merged its Pittsburgh and West Virginia markets.  (*Id.* ¶ 17 n.4.)  Randy Amos ("Amos") became the general manager for the combined market.  (*Id.*)  Although McDermott remained the general manager for the Pittsburgh area, he

3

was placed under Amos' authority.  (*Id.*)  In October 2005, McDermott's general manager position was eliminated.  (*Id.*)  He was demoted to the position of funeral director.  (*Id.*)

On August 15, 2005, Miriam Maizlech ("Maizlech") arrived at Hirsch Funeral Home for her first day of work as a location assistant.  (*Id.* ¶ 22.)  Prise was in Chicago, Illinois, that day in order to attend a Jewish studies class.  (*Id.*)  Maizlech apparently sat alone throughout the day, with no one to train her.  (*Id.*)  Prise contended that it was not her responsibility to train new employees, and that she was not responsible for being at Hirsch Funeral Home on Maizlech's first day of work.  (*Id.*)  McDermott reprimanded Prise the next day for not being present to acquaint Maizlech with her duties.  (*Id.*)  McDermott suggested that Prise exhaust her vacation days in order to attend classes in Chicago, which was apparently in conflict with Prise's understanding of Alderwoods' policies.  (*Id.*)  Prise called Amos later that day to complain about McDermott's comments.  (*Id.* ¶ 23.)  During a conference call held on August 19, 2005, John Blute ("Blute"), Alderwoods' manager for the northeast region, informed Prise that she did not have to exhaust her vacation days in order to further her education.  (*Id.* ¶ 25.)

Nancy Baum ("Baum"), a Christian, passed away in September 2005.  On September 21, 2005, Baum's husband spoke with Hilgefort and requested that Hirsch Funeral Home schedule a visitation for the afternoon of Saturday, September 24, 2005.  (*Id.* ¶ 27.)  Hilgefort was reluctant to schedule the visitation for that day, because Hirsch Funeral Home had customarily refrained from having visitations on the Jewish Sabbath out of respect for the surrounding Jewish community.  (*Id.*)  Hilgefort discussed the matter with Amos, who subsequently conferred with Blute.  (*Id.*)  Katie Leahy ("Leahy"), Alderwoods' director of operations, was also consulted.

(*Id.*)  Blute ultimately instructed Amos and Hilgefort to honor Baum's husband's request for a Saturday visitation.  (*Id.*)

When Prise learned that the visitation had been scheduled to take place on a Saturday, she instructed Hilgefort to reschedule it.  (*Id.* ¶ 28.)  Prise was apparently motivated by both a desire to avoid alienating the Squirrel Hill community and an intention to refrain from performing work on the Jewish Sabbath.  (*Id.*)  After learning about the situation, Amos again conferred with Blute and Leahy.  (*Id.* ¶ 29.)  Ron Collins ("Collins"), Alderwoods' vice president, was also consulted.  (*Id.*)  Amos was apparently instructed to follow the wishes of Baum's husband.  (*Id.*)

During a conference call with Prise, Hilgefort and Maizlech, Amos stated that Alderwoods would honor the request which had been made by Baum's husband.  (*Id.* ¶ 30.)  Prise expressed her objection to the decision, claiming that it would cause Hirsch Funeral Home to lose credibility within Squirrel Hill's Jewish community.  (*Id.*)  Maizlech suggested that Baum's husband be asked to postpone the visitation to Saturday evening at sundown, at which point the Jewish Sabbath would be over.  (Id. ¶ 31.)  Amos was in favor of this idea.  (*Id.*)  After speaking with Hilgefort, Baum's husband agreed to this arrangement.  (*Id.*)

Prise was still resistant to the idea of Hirsch Funeral Home conducting a visitation on a Saturday.  In an email to Leahy sent at 7:07 p.m. on September 21, 2005, Blute stated as follows:

> They decided to have the visitation (8:30-10:30) after the sabbath is over.
> Deborah had been unavailable to answer her phone at first, but now she found out
> and is livid.  Randy is saying he can not control her at all.  She says that randy
> [sic]has disgraced her.

(Defs.' App. in Support of Mot. for Sum. J. on Pl. Deborah Prise's Claims ("Def.'s App.-Prise") at Tab 34.) (Docket No. 110).  On the morning of September 22, 2005, Amos reiterated that

Alderwoods would conduct the visitation pursuant to the understanding between Baum's husband and Hilgefort.  (J.S.-Prise ¶ 32.)  Amos told Prise that she would not have to worry about staffing concerns related to the visitation.  (*Id.*)  Prise apparently argued that it would constitute religion-based discrimination against her for Alderwoods to force her to perform work on the Jewish Sabbath.

Meanwhile, Alderwoods' executives began to discuss the possibility of terminating Prise. (*Id.*)  In an email to Leahy and Blute sent at 4:20 a.m. on September 22, 2005, Collins made the following observations:

> Deborah alleges discrimination against herself but doesn't care to understand the potential of discrimination against others.  Be certain to document as we appear to be headed towards her departure.

(Def.'s App.-Prise at Tab 35.)  The documentary evidence indicates that a tentative decision to terminate Prise was made as early as the morning of September 23, 2005.  (*Id.* at Tab 40.)  That same day, Prise contacted Leahy to express her dissatisfaction with the decision to conduct the Baum visitation on a Saturday.  (J.S.-Prise ¶ 33.)

On Saturday, September 24, 2005, Hilgefort handled the Baum visitation even though he was not scheduled to work on that day.  (*Id.* ¶ 35.)  Leahy and Collins had further discussions about Prise's behavior.  (*Id.*)  They decided to give her a second chance.  (*Id.*)  A decision was apparently made to give Prise a letter informing her that further resistance to Alderwoods' policies would result in the termination of her employment.  (*Id.*)

Prise continued to take issue with Alderwoods' decision to host the Baum visitation on a Saturday.  On the morning of September 25, 2005, Prise made the following observations in an email to Amos:

6

> If you were to go to a Kosher restaurant, you would get ONLY a kosher meal regardless of your desire for any other meal.  You would be served graciously and genourously [sic] but kosherly.  That is what we at Burton L. Hirsch have been striving for as a JFDA member firm.  We will serve anyone, but we will not violate sacred laws.  And to ask a Jewess to break the laws of her religion is remarkably heinous.  Since I have always had issues with working on Shabbos, I have found a way to make it work whilst also being available for an at-need first call.  This is a day that I usually attend communiity [sic] functions or make shabbos visits as aftercare.
>
> We need to be consistent and decide if we are going to be a Jewish Funeral Home.  If that is the case, we must do it well and within halacha.  If not, our preneed business has lots of room to complain and our credibility with the community will be greatly impaired.  Being a Jewish FH does not preclude serving other religions but it does mean operating at a standard consistent with the Jewish Religion and Halacha (Mosaic law).

(Defs.' App.-Prise at Tab 41.)  On September 26, 2005, Amos met with Prise to discuss the situation.  (J.S.-Prise ¶ 37.)  Angie Sanders ("Sanders"), a market administrator, witnessed the meeting.  (*Id.* ¶ 38.)  Prise evidently expressed her unwillingness to work on the Jewish Sabbath, or on Jewish holidays.  ( Def.'s App.-Prise at Tab 42.)  Amos gave Prise a letter warning that future instances of "insubordination" would lead to her discharge.  (*Id.* at Tab 43.)

Shortly thereafter, Amos received messages from three Jewish rabbis expressing support for Prise's efforts to operate Hirsch Funeral Home as a Jewish funeral home and warning that they would discourage the members of their congregations from patronizing Hirsch Funeral Home if it were to engage in practices violative of Jewish law.  (*Id.* at Tab 46.)  In a letter dated September 27, 2005, Rabbi Alvin Berkun warned that Hirsch Funeral Home would "suffer grievous economic harm" if Prise were to be dismissed.  (*Id.*)  In an email to Amos dated September 28, 2005, Rabbi Aaron Benjamin Bisno, the president of Pittsburgh's Reform Rabbis Association and the rabbi of Rodef Shalom Congregation, of which both Prise and Mr. Hirsch

were members, stated that he would no longer "feel comfortable" recommending Hirsch Funeral

Home to his congregants if it were to "turn[] its back on Jewish practice." (*Id.*) In an undated

letter to Amos, Rabbi Shoshana Kaminsky stated as follows:

> As the rabbi of a synagogue located in the Pittsburgh area, I am writing to share
> my thoughts on your insistence that the Burton Hirsch Funeral Home remain open
> on the Jewish sabbath and on our most sacred holidays. Quite frankly, your
> proposal runs entirely counter to the fundamental teachings I strive to pass on to
> the members of my congregation. It is forbidden under Jewish law to hold
> funerals on the sabbath and on Jewish holidays, and I would never consider
> officiating under such conditions. What is more, by placing intolerable pressure
> on Deborah Prise, you threaten to do irreversible harm to your business. Ms. Prise
> is a gifted and dedicated professional who has revived the reputation of the Burton
> Hirsch Funeral Home in the Pittsburgh area. Were you to fire her and force the
> Burton Hirsch Funeral Home to knowingly turn its back on accepted Jewish
> practice, I would personally and officially discourage the members of my
> congregation from considering this funeral home when it came time to do pre-
> planning for funerals, and I would urge those who had already made arrangements
> through Burton Hirsch to consider switching to another funeral home.
>
> I believe your recommendation to be wrong-headed, intolerant of Jewish practices
> and teachings, and potentially disastrous for your business. I urge you to
> reconsider.
>
> I am happy to be available to you or anyone else within the Alderwood Group for
> consultation or assistance.

(*Id.*) These communications from rabbis evidently resulted from Prise's consultations with her

own rabbi. (*Id.* at Tab 48.)

On the morning of September 29, 2005, Prise sent Leahy an email expressing an interest

in discussing "damage control." (*Id.* at Tab 47.) Prise and Leahy spoke later that day. (J.S.-

Prise ¶ 41.) Leahy instructed Prise to take two weeks off. (*Id.*) Prise's mother was ill. (*Id.*)

Leahy told Prise not to return to work until October 14, 2005, which was the day after the Jewish

holiday of Yom Kippur. (Def.'s App.-Prise at Tab 48.) During this two-week period, Prise

continued to receive her salary and benefits.  (J.S.-Prise ¶ 41.)  She, however, was unable to earn commissions from the sale of pre-need insurance policies during this period of time.  (*Id.*)  Prise returned from leave in mid-October and resumed her duties.  On October 27, 2005, Prise filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") pursuant to 42 U.S.C. § 2000e-5(b), alleging violations of Title VII.  (Pls.' Joint App. in Response to Defs.' Mot. for Summary J. ("Pls.' J.A.") at Tab 18.)  (Docket No. 137.)  The charge was dual-filed with the Pennsylvania Human Relations Commission ("PHRC") in order to exhaust administratively parallel claims under the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. § 951 *et seq.*

The question whether Hirsch Funeral Home should accommodate requests for Saturday visitations was discussed at a staff meeting held on November 2, 2005.  (J.S.-Prise ¶ 44.)  Rady argued that if Hirsch Funeral Home were to close on Saturdays and Jewish holidays, Christian funeral directors should be permitted to miss work on Christmas.  (*Id.*)  Prise took issue with Rady's assertion, contending that while Jews were forbidden to work on the Jewish Sabbath, Christians were not forbidden to work on Christmas.  (*Id.*)  Because of the ongoing tensions surrounding Prise's resistance to Alderwoods' determination that Hirsch Funeral Home should honor requests for Saturday visitations, Leahy and Collins decided to place Prise on a temporary paid leave after the staff meeting.  (*Id.* ¶ 45.)  During her paid leave, however, Prise was unable to earn commissions from the sale of pre-need insurance policies.  (*Id.*)  In an email to Collins dated November 2, 2005, Leahy stated as follows:

•      Pat is going over to meet with Deborah with Pete now [sic]

- Explain [sic] her attorney has spoken to our attorney and that while they are talking it would be best that she stay at home with pay until it is resolved.
- Pat will work with Pete and revise the schedule but felt that the staff would be much happier and it would not be a problem.

(Pls.' J.A. at Tab 20.)  Prise had filed her EEOC and PHRC charges six days earlier.

With her status at Hirsch Funeral Home uncertain, Prise contacted Eugene C. Ogrodnik ("Ogrodnik"), the president and chief executive officer ("CEO") of PIMS, about a vacancy at PIMS for a director of development position.  (Def.'s App.-Prise at Tab 56.)  PIMS extended an offer to Prise on November 11, 2005.  (*Id.* at Tab 54.)  Although it is clear that Prise accepted this offer, there is some dispute about when this acceptance occurred.  According to Ogrodnik, Prise formally accepted an offer of employment with PIMS on November 14, 2005.  (*Id.* at Tab 56.)  The record contains an email from Prise to Ogrodnik dated November 15, 2005, in which Prise stated as follows:

> Confidentially speaking (very confidentially), I am trying to figure out who my direct supervisor at Alderwoods is at this point and given my paid leave status the ramifications as to my responsibilities insofar as how much notice they will require.  I should have an answer from them by day's end.  They are aware that I am looking to wrap things up and seek other employment but I did not disclose details.

(*Id.* at Tab 57.)  That same day, Thomas J. Harris ("Harris"), Alderwoods' in-house attorney, claims to have received a voicemail from Ann-Marie Mizel ("Mizel"), Prise's attorney, indicating that Prise had accepted a position with PIMS.  (*Id.* at Tab 58.)  Mizel disputes Harris' claim. (Pls.' J.A. at Tabs 16, 36.)  Prise contends that she never wanted to lose her position at Hirsch Funeral Home, and that her email to Ogrodnik was a stalling tactic designed to give her

more time to inquire concerning whether Alderwoods was willing to let her continue with her job at Hirsch Funeral Home.  (J.S.-Prise ¶¶ 47-48.)

Leahy claims to have received an email from Harris dated November 15, 2005, indicating that Prise voluntarily resigned from her position at Hirsch Funeral Home.  (Def.'s App.-Prise at Tab 6.)   Leahy recorded Prise's change in status as a voluntary resignation.  (*Id.* at Tab 59.)  Amos told the staff at Hirsch Funeral Home that Prise had tendered her resignation.  (J.S.-Prise ¶ 53.)  Prise disputes Alderwoods' contention that the termination of her employment was voluntary.  (*Id.*)  On November 21, 2005, Maizlech emailed the following message to Amos:

> #1 I learned over the weekend that the email about a resignation was about someone else in our community w/ Jewish political ties.  So this was NOT about Deborah as first thought.  We were both speaking in code and assumed we were on the same page.  OOPS...
> #2 FYI when I left work on Friday I called Deborah to tell her that under the circumstances I felt that she should have informed us of her decision to resign and that I was annoyed and disappointed etc and she said that she agreed that if and when a resignation would come about she would indeed let us know personally.  That SHE DID NOT RESIGN!  So what's going on?

Pls.' J.A. at Tab 21.)

Prise worked for PIMS from December 2005 through October 19, 2007.  (J.S.-Prise ¶ 74; Defs.' App.-Prise at Tab 56.)  Ogrodnik terminated Prise's employment with PIMS on October 19, 2007, after she refused his request that she resign.  (*Id.* at Tabs 56, 60.)  Prise filed EEOC and PHRC charges against PIMS related to her discharge.  (Pls.' J.A. at Tab 18.)  Those charges are currently pending.

**B.     Rady**

Rady graduated from PIMS in 1997 and obtained her funeral director's license in 1998.  (Pl. Rady's Counter-Statements of Fact with Defs.' Responses ("Rady Countersts.")

¶ 1.)  (Doc. No. 158.)[1]  Hilgefort and Rady had been classmates at PIMS.  (J.S.-Rady ¶ 14.)  Rady had been away from the funeral business for awhile, but she told Hilgefort that she was interested in getting back into it.  (*Id.*)  Rady formally applied for a position with Alderwoods in May 2002.  (*Id.* ¶ 15.)  In her application, she apparently overstated her experience as a funeral director.  (*Id.*)

McDermott explained to Rady that the only position available at Alderwoods at the time was an entry-level intern position.  (*Id.* ¶ 16.)  Rady accepted this position in July 2002, hoping to reestablish herself within the funeral business.  (*Id.*)  Although McDermott told Rady that she might be promoted to the position of funeral director at a later date, he made no guarantee that a promotion would occur.  (*Id.*)  Rady began to work primarily at Samson Funeral Home.  (*Id.*)  She was expected to assist at Alderwoods' other Pittsburgh-area funeral homes on an as-needed basis.  (*Id.*)  Her initial rate of pay was $10.00 per hour.  (*Id.* ¶ 17.)  In October 2002, at Alderwoods' expense, Rady became licensed to sell pre-need insurance policies.  (*Id.*)  She was eligible to receive commissions associated with the sale of pre-need insurance policies.  (*Id.*)

On March 13, 2003, McDermott reprimanded Rady for spilling cremated human remains into a sink drain.  (*Id.* ¶ 18.)  This spillage was apparently unintentional.  (*Id.*)  In any event, Rady was promoted to the position of funeral director/embalmer on August 24, 2003.  (*Id.* ¶ 19.)  Her rate of pay, which had already been increased to $11.00 per hour, was further increased to $15.25 per hour due to the promotion.  (*Id.*)

Adlerwoods closed Samson Funeral Home's physical location in February 2004.  (*Id.* ¶ 20.)  Samson Funeral Home's funeral home license was hung at Brandt Funeral Home, and

---

[1]Rady's Counterstatements of Fact with Defendants' Responses are filed at docket number 158, and begin on page 26, following the Joint Statement of Facts Relative to Defendants' Motion for Summary Judgment on Rady's Claim.

Alderwoods fulfilled Samson Funeral Home's pre-need obligations there.  (*Id.*)  Rady was transferred to Hirsch Funeral Home, but she provided support services at Brandt Funeral Home when necessary.  (*Id.* at ¶ 21.)  Her rate of pay was increased to $16.00 per hour in May 2004. (*Id.*) During the fall of 2004, Rady was transferred to Brandt Funeral Home.  (*Id.* at ¶ 22.)  She reported to Peter Johnson ("Johnson"), who was the location manager at Brandt Funeral Home. (*Id.*) Although she was primarily assigned to work at Brandt Funeral Home, Rady was still expected to provide support services at Hirsch Funeral Home.  (*Id.*)

In November 2004, Rady filed with the EEOC a charge of discrimination against Brandt Funeral Home, alleging that she had suffered discrimination because of her sex.  (Rady Countersts. ¶ 24.)  She indicated in her EEOC charge that Brandt Funeral Home was "a member of the Alderwoods Group."  (Defs.' App. at Tab 40.)  These claims were settled on March 29, 2005, when the parties signed a written settlement agreement.  (*Id.* at Tab 41.)  As a part of the settlement agreement, Alderwoods agreed to pay Rady an amount equal to the commissions that she would have made by selling pre-need insurance policies had she been allowed to make such sales.  (Rady Countersts. ¶ 25.)  Rady agreed to waive any claims that she may have had, at that time, under Title VII or the Equal Pay Act.  (J.S.-Rady ¶ 23.)

Rady's rate of pay was increased to $16.50 per hour in May 2005.  (*Id.* ¶ 24.)  During the spring of 2005, Amos became the general manager for the merged Pittsburgh and West Virginia markets.  (*Id.* ¶ 25.)  During this same period of time, Alderwoods had a location manager vacancy at Hirsch Funeral Home.  Rady applied for the position at Hirsch Funeral Home, but it was ultimately given to Prise.  On May 9, 2005, McDermott emailed the following message to Amos:

> Has anyone discussed the hiring of Deborah as manager with Heather Rady, [sic]
> she was the other candidate for the job.  She is quick to go to HR and/or the
> EEOC.  The decision to put Deborah in the position should have been or needs to
> be discussed with Heather.

(Pls.' J.A. at Tab 30.)  In an email dated May 26, 2005, Johnson told Amos that employee morale

was suffering because of Rady's complaints about her need to perform more and more work to

make up for the deficiencies of other employees.  (Defs.' App.-Rady at Tab 43.)

Alderwoods' personnel continued to discuss their concerns about Rady's performance.

On July 6, 2005, McDermott informed Amos in an email that Prise received a complaint from a

woman contending that Rady was "rude to her" during a funeral service at Hirsch Funeral Home.

(*Id.* at Tab 45.)  He advised that the entire staff was "tired" of Rady's "attitude" and "lack of

concern" for the families served by Alderwoods.  (*Id.*)  The next day, Johnson sent Amos an

email about Rady, claiming that Rady's "poison attitude" was "affecting every employee."  (*Id.* at

Tab 44.)  He indicated that Rady would need to be dismissed if her poor behavior were to

continue, despite the fact that she was known to be litigious.  (*Id.*)  He complained that the

situation with Rady was "getting old."  (*Id.*)

On July 21, 2005, Johnson issued a verbal warning to Rady.  (*Id.* at Tab 46.)  A written

record described the reasons for the warning as follows:

> On, [sic] June 30, 2005, Heather left for vacation at 4:00 PM, when on duty/call
> until 8:00 AM the following morning.  She did not discuss any arrangements for
> coverage with other staff and did not notify the Mortuary School student that was
> also on call.. [sic] The Mortuary School student would have received the initial
> call and would have notified Heather is [sic] necessary.  At 4:45 PM, Pat
> McDermott call [sic] her cell phone and left a message for her to call him back to
> discuss if arrangements had been made with other staff [sic] she did not return the
> call.

14

(*Id.*)  Rady's alleged failure to respond to telephone calls and pages was apparently an ongoing problem.  (J.S.-Rady ¶ 28.)  Alderwoods provided her with a special pager that was designed to overcome reception-related difficulties that she had been having with her previous pager.  (*Id.*)

In an email to Amos dated January 20, 2006, Johnson again complained about Rady's performance.  (Defs.' app. at Tab 47.)  In that email, Johnson made the following comments about Rady:

> I have never had to deal with someone like her.  She is a very difficult employee.  I would appreciate your thoughts and ideas.  Something has to be done at some point and I think we both need to do it.

(*Id.*)  In February 2006, a family blamed Rady for a rabbi not being transported on time for a cemetery service.  (J.S.-Rady ¶ 30.)  The late arrival of the rabbi was evidently caused when John Fodor ("Fodor"), a part-time employee, went to the wrong address to pick up the rabbi.  (Defs.' App. at Tab 49.)  Alderwoods gave the aggrieved family a discount to compensate for the mistake.  (*Id.* at Tab 50.)  Rady refused to provide documentation concerning the discount because she did not believe that the incident was her fault.  (J.S.-Rady ¶ 31.)   A few weeks later, the same rabbi was left at a cemetery without a ride after a service because of an error by an Alderwoods' employee.  (Defs.' App. at Tab 51.)  Although it is unclear what happened in this instance, Johnson told Amos that Rady was to blame.  (*Id.*)

On the evening of March 27, 2006, Johnson sent an email to Amos and Blute recommending that Rady be terminated.  (*Id*. at Tab 52.)  He claimed that Rady complained about having to report for certain duties at Hirsch Funeral Home.  (*Id.*)  Johnson made the following observations:

It has gotten to the point where nobody want [sic] to work with her, [sic] students, part-time, full time employees.  The staff all comes forward to ask when she will be held responsible for all the things she does.  She will not get involved with the business or community.  She cannot be trusted to complete all the details and follow thru [sic] with arrangements, [sic] we all have to pitch in and clean up her cases.  She has poor prep skills.  I know she is litigious and has zinged us with the EEOC case.  But my goodness it is horrible.  She has no redeeming quality for our business or our success.  Can HR look this over and can we move forward?

(*Id.*)  That same evening, Leahy emailed the following message to Blute:

Talk with Chuck and see if we have cause, [sic] we should by now.  I won't be surprised if Heather does not join Deborah in her quest[2] so I would like to ensure it is tight.  Having said that, Heather clearly is not living our values in teamwork, communication, or compassion and I am in agreement that the relationship is no longer a productive one and [sic] she is not serving families in their best interest during their greatest time of need.

(*Id.* at Tab 54.)  The "Chuck" referred to in Leahy's email was Chuck Gibson ("Gibson"), who served as a human resources manager for Alderwoods.  (J.S.-Rady ¶ 34.)  Gibson recommended that Johnson meet with Rady in order to provide instructions about how she could improve her performance.  (*Id.*)  He also recommended that any future instances of "misconduct" by Rady be documented.  (Defs.' App. at Tab 55.)

On April 6, 2006, Rady filed new charges of discrimination with the EEOC and the PHRC.  (*Id.* at Tab 56.)  She alleged sex-based discrimination under Title VII, the Equal Pay Act and the PHRA, as well as retaliation stemming from her 2004 charges of discrimination.  (*Id.*)  In the "particulars" section of her EEOC charge form, she made the following statements:

1.       I have been employed by the Respondent since July 15, 2002.  Although I performed the duties of a Funeral Director immediately upon my hiring, they titled me as an Intern/Apprentice and paid me as such.  Even after my

---

[2]Leahy's comment about Deborah's "quest" appears to be a reference to Prise's initiation of discrimination charges against Alderwoods.

title was changed to Intern/Funeral Director on or about December 30, 2002, my salary was not increased at that time.

I have been repeatedly denied the opportunity to apply for promotions that were given to males who have not filed charges of discrimination.

I have been disciplined more strictly than similarly-situated males who have not filed charges of discrimination.

I have consistently been paid less money and been awarded fewer benefits than similarly-situated, often less-qualified males who have not filed charges of discrimination.

I have been treated in a demeaning fashion due to my sex, female, and have observed other females treated in a demeaning fashion without any corrective action taken by management [sic]

I have been repeatedly subjected to offensive talk of a sexual nature in the office, of which Management was aware but took no corrective action.

2.      I have been subjected to discriminatory treatment since becoming employed by the Respondent.  However, since filing my prior charge of discrimination the scrutiny and treatment has become worse, as indicated above, in retaliation and in their effort to force me to leave my employment and/or terminate me from my employment.

3.      I believe that I have been discriminated against because of my sex, female, in violation of Title VII of the Civil Rights Act of 1964, as amended (Title VII), and/or the Equal Pay Act of 1967, as amended (the EPA), in that male employees are permitted to sleep on the job and not disciplined as harshly as I have been for less serious matters, [sic] additionally, they are paid wages and benefits higher than the females in similar job classifications.  Additionally, since filing my original charge of discrimination, my treatment has become worse in that I am being scrutinized more closely, disciplined and denied other promotions.  They were to post promotional positions, but have continued to deny opportunities because they refused to post the positions.

(*Id.*)  Rady's responses to a general intake questionnaire were more specific.  She alleged that McDermott and Johnson were promoted to positions for which she was never given the opportunity to apply.  (*Id.* at Tab 58.)  She claimed that Prise was "harassed," "retaliated

17

against," and "fired" for filing a charge of discrimination.  (*Id.*)  She contended that Claudine

Young ("Young"), a female employee, resigned because of a "hostile work environment."  (*Id.*)

She accused McDermott of both "sexual harassment" and religion-based discrimination.  (*Id.*)

She also claimed that McDermott made inappropriate interjections during her interview on

March 23, 2005, for the position of location manager at Hirsch Funeral Home, thereby

preventing her from being promoted.  (*Id.*)  That promotion was ultimately given to Prise.  In

addition, Rady alleged that Larry Beck ("Beck"), a male employee, was not properly disciplined

for serious instances of misconduct.  (*Id.*)

Rady did not tell anyone at Alderwoods that she filed new charges of discrimination.

(J.S.-Rady ¶ 35.)  On April 7, 2006, just one day after the filing of the charges, Johnson and

Amos met with Rady to discuss her performance and their expectations for her in the future.  (*Id.*

¶ 36.)  Although Johnson and Amos viewed the meeting in a positive light, Rady contends that it

was "harassing and demeaning."  ( *Id.* ¶¶ 36-37.)  According to Rady, the meeting went on for

approximately two and a half hours.  (*Id.*)

On the morning of April 28, 2006, Amos sent Johnson an email with the word "Justin"

appearing in the subject line.  (Pls.' J.A.. at Tab 25.)  The word "Justin" appears to be a reference

to Justin Huntsman ("Huntsman"), who was working for Alderwoods as a student-level intern at

the time.  (Rady Countersts. ¶ 15.)  In the email, Amos indicated that he wanted to promote

Huntsman, but that a decline in volume at Brandt Funeral Home was making such a promotion

hard to justify.  (Pls.' J.A. at Tab 25.)  This message also included the following statements:

> Replacement of Heather, how do we get that done?  A suggestion we might ask
> her to transfer to strictly preneed sales!  We need someone, it will get her out of

> day to day operations with Pat etc..............continue to work on a paper trail for
> dismissal................

(*Id.*)  Despite Amos and Johnson seeking to dismiss her, Rady's rate of pay was raised to $17.00

per hour in May 2006.  (J.S.-Rady ¶ 38.)

Throughout the month of June 2006, Johnson carefully documented a series of incidents

in which Rady had allegedly failed to complete her assigned tasks.  (Defs.' App. at Tabs 62, 63.)

On June 20, 2006, Johnson emailed the following message to Amos:

> Randy, we need to talk again about Heather.  Everybody is fed up.  I have Justin
> and Michael documenting all their grievances and problems.  She needs to go,
> [sic] she is negatively affecting the staff and our business.

(*Id.* at Tab 64.)  Hilgefort forwarded a list of Rady's alleged deficiencies to Johnson on June 23,

2006.  (*Id.* at Tab 65.)

On July 14, 2006, Sanford Robinowitz passed away.  (*Id.* at Tab 66.)  Rady apparently

arranged the funeral.  (*Id.*)  The Robinowitz family was awarded a $250.00 discount by

Alderwoods.  (*Id.*)  Alderwoods' documentation of the discount indicated that the Robinowitz

family was upset about Rady's performance and that they asked that she be fired.  (*Id.*)   In a

letter to Johnson dated July 19, 2006, Maizlech made the following comments:

> Just to reiterate our conversation from earlier today, I feel the need to
> remind you that I am ***neither a licensed funeral director nor a licensed funeral
> arranger***.  Yet on Friday, July 14, 2006 when I asked Heather if I could "sit in and
> help" with making funeral arrangements for the Robinowitz family; [sic] Heather
> graciously agreed.  However, I did not plan to "fly solo."  Heather was not an
> active participant having my [sic] calling the Rabbi, the cemetery, and the
> caretaker.  If I seemed to be so actively involved it was really only because I saw
> the need and tried my best to serve the family–seamless service.
>
> I feel that I am an asset to the company, [sic] when assisting in the
> Robinowitz case, the family was torn between going to where Rabbi Wasserman
> suggested (BLH) and Jennifer Jordan in White Oak where the family is from.

They chose BLH because of the connection with **ME**.  I cannot and will not accept the responsibility for incomplete or inappropriate arrangements.

I do have concerns that so often Heather is upstairs either reading on the computer or on her cell phone during a visitation or service [sic] leaving me to make certain that everything is running smoothly.  I like the trust factor involved and love interacting with the community, yet I am not comfortable with the apathetic attitude and lack of teamwork.

(*Id.* at Tab 67.)

On July 31, 2006, Rady presented Johnson with a letter of resignation.  (*Id.* at Tab 68.)  In that letter, she stated that she could no longer tolerate the discrimination and harassment that she had experienced while employed by Alderwoods.  (*Id.*)  The record indicates that she accepted an offer of employment from the Meridian Mortuary Group ("Meridian") five days earlier.  (*Id.* at Tab 69.)  Pursuant to the terms of her employment contract with Meridian, Rady was to work at the Farnsworth Funeral Home for an annual salary of $43,000.00.  (*Id.* at Tab 70.)  She also received a $500.00 signing bonus.  (*Id.*)

On August 2, 2006, Johnson emailed the following message to Amos concerning Rady's resignation:

Randy, Heather was telling Michael wwhile [sic] Kim and I were standing with her that she is leaving us and going to work with Meridian Mortuary Group at one of their Pittsburgh locations.  She said she had been offered the job and couldn't turn it down.  She went on to say that obviously she was going for less than she got here and that she was getting double the clothing allowance, two students as helpers and was in charge of the location.  She also said that they had a much nicer working schedule too.  So, she had a better job and that is why she is leaving, despite what she put in her resignation letter.  I guess that stuff was there to pad her EEOC complaint?

Randy, she also wants to know if she can use her remaining vacation next week during her final work week.  I told her I would speak to you about that before I would approve or decline it.  What are your thoughts?

20

(*Id.* at Tab 71.)  Rady's employment with Alderwoods apparently ended shortly thereafter.[3]

### *Procedural History*

The EEOC issued "right to sue" letters to Prise and Rady on August 22, 2006.  (Compl. Ex. 1.) (Doc. No. 1.)  On November 6, 2006, Prise and Rady commenced this action against Alderwoods, Hirsch Funeral Home, Brandt Funeral Home, Samson Funeral Home, and the Neill Funeral Home ("Neill Funeral Home").  (Compl. ¶¶ 12-16.)  Neill Funeral Home, which is also owned and operated by Alderwoods, is located in Harrisburg, Pennsylvania.  (*Id.* ¶ 16.)  On January 8, 2007, defendants filed a partial motion to dismiss, pursuant to Federal Rule of  Civil Procedure 12(b)(6).  (Defs.'Partial Mot. Dismiss.) (Docket No. 12.)  On February 28, 2007, Prise and Rady filed a first amended complaint, adding Service Corporation International ("SCI") as a defendant.  (First Am. Compl.)  (Docket No. 23.)  This action was apparently taken because of an alleged merger agreement between Alderwoods and SCI.  (*Id.* at ¶¶ 13-26.)   On March 13, 2007, the court denied defendants' motion to dismiss as moot upon the filing of the first amended complaint.  (Order) (Doc. No. 26.)  On April 17, 2007, the PHRC issued "right to sue" letters to Prise and Rady.  (Mot. Second Am. Compl. Ex. 3 at 35-42.) (Doc. No. 33.)  On June 8, 2007, Prise and Rady sought leave to amend their complaint in order add claims under the PHRA, and to clarify the nature of their claims against SCI.  (Mot. Second Am. Compl.)  On October 25, 2007, at oral argument proceedings, the court permitted plaintiffs to add their PHRA claims, but denied plaintiffs' request to add a successor liability claim against defendant SCI.  On October

---

[3]Most of the relevant facts are included in the background section.  Some additional facts, however, appear in the discussion section and are cited to the record therein.

26, 2007, Prise and Rady filed a second amended complaint against Alderwoods, Hirsch Funeral

Home, Brandt Funeral Home, Samson Funeral Home and Neill Funeral Home.  (Second Am.

Compl.)  (Docket No. 39.)  SCI was not named as a defendant in the second amended complaint.

(*Id.*)  On November 9, 2007, defendants filed a partial motion to dismiss pursuant to Federal

Rule of Civil Procedure 12(b)(6). (Defs.' Partial Mot. Dismiss.)  (Docket No. 40.)  On January

15, 2008, the motion was partially granted and partially denied.  All claims against Neill Funeral

Home were dismissed without prejudice.  Some claims against Alderwoods, Hirsch Funeral

Home, Brandt Funeral Home and Samson Funeral Home were dismissed.[4]  In response to the

decision of the United States Court of Appeals for the Third Circuit in *Phillips v. County of*

*Allegheny*, 515 F.3d 224 (3d Cir. 2008), on May 15, 2008, Prise and Rady filed a motion for

leave to reinstate some of the claims which had previously been dismissed.  (Doc. No. 76.)  On

June 23, 2008, the motion was partially granted and partially denied.[5]

On June 27, 2008, Prise and Rady filed a third amended complaint.  (Third Am. Compl.)

(Docket No. 84.)  Prise asserted claims under Title VII and the PHRA for religion-based and sex-

based discrimination, and for retaliation.  (*Id.* ¶¶ 66-81.)  She also asserted claims under the

Equal Pay Act for sex-based pay disparities.  (*Id.* ¶¶ 82-86.)  Prise named both Alderwoods and

Hirsch Funeral Home as defendants.  (*Id.* ¶¶ 66-86.)  Rady asserted claims under Title VII and

the PHRA for  sex-based discrimination and retaliation.  (*Id.* ¶¶ 87-99.)  She also asserted claims

---

[4]All counts by Prise against Samson Funeral Home and Brandt Funeral Home were dismissed without prejudice.  Rady's claims under the Equal Pay Act and disparate treatment based on pay claims were dismissed without prejudice.  Rady's sexual discrimination claims were dismissed.

[5]Motion for leave to amend granted with respect to the Equal Pay Act claim, and denied with respect to the hostile work environment claim.  (Docket minute entry filed on June 23, 2008.)

under the Equal Pay Act for unequal pay.  (*Id.* ¶¶ 100-104.)  She named Alderwoods, Hirsch

Funeral Home, Brandt Funeral Home and Samson Funeral Home as defendants.  (*Id.* ¶¶ 87-104.)

On July 2, 2008, defendants filed a motion to strike Rady's sex-based discrimination claims

under Title VII and the PHRA.  (Defs.' Mot. Strike) (Doc. No. 85.)  On November 17, 2008, the

court granted the motion, leaving Rady to pursue only her retaliation claims under Title VII and

the PHRA and her unequal pay claims under the Equal Pay Act.  On January 26, 2009, three

motions for summary judgment were filed.  Defendants filed separate motions for summary

judgment against Prise and Rady, seeking the dismissal of all remaining claims.  (Doc. Nos. 107,

111.)  Plaintiffs moved for partial summary judgment solely with respect to Prise's retaliation

claims under Title VII and the PHRA, conceding that genuine issues of material fact existed with

respect to all other claims.  (Doc. No. 116.)  These summary judgment motions are the subject of

this memorandum opinion.

### *Standard of Review*

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if,

drawing all reasonable inferences in favor of the nonmoving party, "the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(c).  A motion for summary judgment will not be defeated by the mere existence of some

disputed facts, but will be defeated only if there is a genuine issue of material fact.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  In determining whether a dispute is genuine,

the court's function is not to weigh the evidence or to determine the truth of the matter, but only

to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 249.

***Discussion***

**A.    Prise's claims**

In the third amended complaint, Prise alleges both religion-based and sex-based discrimination under Title VII and the PHRA.  In Prise's brief in response to defendants' motion for summary judgement, however, she indicated that she was withdrawing her sex-based discrimination claims concerning her "suspensions and termination."  (Prise's Mem. Resp. Defs.' Mot. Sum. J. 1 n.2.) (Docket No. 131.)  For this reason, the court need only address her religion-based discrimination claims under Title VII and the PHRA, her retaliation claims under those statutes, and her Equal Pay Act claims.  Prise acknowledges that Alderwoods, rather than Hirsch Funeral Home, was her employer during the period of time at issue.  (*Id.* at 18 n.10.)  Therefore, Prise no longer asserts claims against Hirsch Funeral Home.

**1.    Religion-Based Discrimination**

Prise's substantive antidiscrimination claims arise under Title VII and the PHRA.  Title VII's antidiscrimination provision, which is codified at 42 U.S.C. § 2000e-2(a), provides:

> **§ 2000e-2.  Unlawful employment practices**
> **(a) Employer practices.**  It shall be an unlawful employment practice for an employer--
>> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his

24

status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a).  The applicable provision of the PHRA provides:

**§ 955.  Unlawful Discriminatory Practices**
It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:
(a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

43 PA. STAT. § 955(a).  Generally speaking, the Pennsylvania courts construe the parallel provisions of the PHRA to be coextensive with their federal counterparts.  *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996); *Stultz v. Reese Bros, Inc.*, 835 A.2d 754, 759 (Pa. Super. Ct. 2003).  The PHRA should be interpreted "as identical to federal anti-discrimination laws except where there is something specifically different in its language" justifying a different construction. *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567 (3d Cir. 2002).  The term "religious creed" is not defined within the text of the PHRA.  43 PA. STAT. § 954.  Consequently, the court will construe the term "religious creed" within the language of the PHRA to have the same meaning as the term "religion" within the language of Title VII.

In 1972, Congress amended Title VII to add the following statutory definition:

The term "religion" includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably

25

accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j); Pub. L. No. 92-260; 86 Stat. 103 (1972).  This statutory definition was designed to codify a preexisting guideline promulgated by the EEOC.  *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 76 n.11 (1977).  As the plain language of the statute makes clear, a covered employer is required to "reasonably accommodate to an employee's . . . religious observance or practice" unless an accommodation would impose an "undue hardship on the conduct of the employer's business."  42 U.S.C. § 2000e(j).

Prise claims that Alderwoods violated her rights under Title VII and the PHRA by issuing a final warning to her, suspending her twice, and terminating her *"because of her religion."* (Third Am. Compl. ¶¶ 67, 75.)  She also claims that Alderwoods violated Title VII and the PHRA by failing to "reasonably accommodate" her observance of the Sabbath.  *(Id.* ¶¶ 68, 76.) The first type of claim is commonly referred to as a "disparate treatment" claim, while the second type of claim is typically referred to as a "failure to accommodate" claim.  *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 281 (3d Cir. 2001).

a.    **Disparate Treatment**

There are two basic ways in which an individual can pursue a disparate treatment claim under Title VII.  Where no "direct evidence" of discrimination exists, the Supreme Court's analyses in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), provide the applicable framework for allocating the requisite burdens of proof and production.  Under the *McDonnell Douglas-Burdine* framework, the plaintiff must establish a prima facie case of impermissible discrimination.

*McDonnell Douglas*, 411 U.S. at 802.  If a prima facie case of discrimination is established, the

defendant must articulate legitimate, nondiscriminatory reasons for treating the plaintiff in an

adverse manner.  *Id.* at 802-03.  If the defendant overcomes this hurdle, the plaintiff must

demonstrate that the reasons given by the defendant to justify the treatment are merely a pretext

for illegal employment discrimination.  *Id.* at 804-05.  Evidence that an employer's stated reasons

for an adverse employment action are unworthy of credence is one form of circumstantial

evidence that a plaintiff can use to establish the existence of intentional discrimination.  *Desert*

*Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

The *McDonnell Douglas-Burdine* framework does not apply in employment

discrimination cases in which the plaintiff presents "direct evidence" of discrimination.

*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).  Direct evidence of discrimination is

evidence that is so revealing of a discriminatory animus that it is not necessary for the plaintiff to

rely on a presumption from his or her prima facie case to shift the burden of production to the

defendant.  *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1097-98 (3d Cir. 1995).  Where

direct evidence of discrimination exists, there is no need for an *inference* of discrimination to be

drawn, since the discrimination itself is readily transparent.  *Id.*

Regardless how a plaintiff attempts to establish his or her case, the ultimate question is

whether the employer engaged in unlawful discrimination.  *St. Mary's Honor Ctr v. Hicks*, 509

U.S. 502, 519 (1993).  In determining whether Alderwoods' conduct was unlawful, the court is

mindful that the Civil Rights Act of 1991 added the following language to Title VII:

> **(m) Impermissible consideration of race, color, religion, sex, or national**
> **origin in employment practices.**  Except as otherwise provided in this
> subchapter, an unlawful employment practice is established when the complaining

party demonstrates that race, color, religion, sex, or national origin was a
motivating factor for any employment practice, even though other factors also
motivated the practice.

42 U.S.C. § 2000e-2(m); Pub. L. No. 102-166, § 107; 105 Stat. 1071, 1075 (1991).[6]  In *Desert
Palace, Inc. v. Costa*, 539 U.S. 90 (2003), the Supreme Court held that a plaintiff need not
present "direct evidence" of discrimination in order to obtain a "mixed-motive" instruction under
this provision, and that a court may give such an instruction where the plaintiff has presented
"sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that
race, color, religion, sex, or national origin was a motivating factor for any employment
practice." *Desert Palace*, 539 U.S. at 101-02 (internal quotation marks omitted).  Accordingly,
Prise can defeat Alderwoods' motion for summary judgment by presenting sufficient evidence to
enable a reasonable jury to conclude that her religion was either a *motivating* or *determinative*
factor behind Alderwoods' adverse personnel decisions.[7]  *Vereen v. Woodland Hills Sch. Dist.*,
No. 06-462, 2008 U.S. Dist. LEXIS 23075, at **48-53 (W.D. Pa. Mar. 24, 2008).

    Before proceeding to analyze Prise's claims under the *McDonnell Douglas-Burdine*
framework, the court must determine whether the record contains "direct evidence" of religion-
based discrimination.  In two separate affidavits, Mizel asserted that Julie Herman ("Herman"), a

---

[6]Although not directly relevant to the court's analysis at this stage, it is noteworthy that 42 U.S.C. § 2000e-
5(g)(2)(B) provides a partial affirmative defense for an employer able to establish that it "would have taken the same
action in the absence of the impermissible motivating factor."  42 U.S.C. § 2000e-5(g)(2)(B).  Upon such a showing,
a court can still grant declaratory and injunctive relief, as well as "attorney's fees and costs demonstrated to be
directly attributable only to the pursuit of a claim" under 42 U.S.C. § 2000e-2(m), but may not "award damages or
issue an order requiring any admission, reinstatement, hiring, promotion, or payment."  *Id.*

[7]In *Vereen v. Woodland Hills School District*, No. 06-462, 2008 U.S. Dist. LEXIS 23075, at **48-53
(W.D. Pa. Mar. 24, 2008), this court explained why it was necessary for a court presented with a disparate treatment
claim under Title VII to incorporate a "mixed-motive" analysis at the summary judgment stage.  The court adheres to
the line of reasoning employed in *Vereen*.  *Vereen*, 2008 U.S. Dist. LEXIS 23075, at *53 ("After all, the summary
judgment inquiry is inextricably linked with what a reasonable  *jury* could or could not decide, which can only be
determined by reference to *what* the jury may ultimately be asked to consider.").

corporate attorney for Alderwoods, stated on November 2, 2005, that Alderwoods wanted to

negotiate a separation agreement with Prise because she had been "striving to adhere more to

Jewish law than [wa]s necessary to appeal to the Jewish community."  (Pls.' J.A. at Tabs 16 ¶ 6,

36 ¶ 6.)  Prise contends that this statement by Herman, if believed, would constitute an admission

that Alderwoods was "discriminating" against her because she was "too Jewish."  (Prise  Mem.

Resp. Defs.' Mot. Sum. J. 13.)

      While the court assumes (as it must at this stage in the litigation) that Herman made this

statement to Mizel, the statement does not constitute direct evidence of discrimination.  The

record is replete with evidence that Prise was striving to run Hirsch Funeral Home in strict

accordance with Jewish law, and that her superiors at Alderwoods expressed an interest in

accommodating the needs of non-Jewish customers even when doing so would contravene

Jewish law.  This internal debate within Alderwoods manifested itself quite vividly in Prise's

September 25, 2005 email to Amos, in which she stated that while Hirsch Funeral Home's status

as a Jewish funeral home did not preclude Hirsch Funeral Home from serving non-Jewish

customers, it did preclude Hirsch Funeral Home from operating in a manner that was inconsistent

with Jewish law.  (Defs.' App.-Prise at Tab 41.)  Herman's statement to Mizel was made *after*

Prise was informed that she was being placed on involuntary leave.  (Pls.' J.A. at Tab 16 ¶¶ 5-6.)

In a declaration dated January 21, 2009, Leahy stated that Collins and she decided on November

2, 2005, to place Prise on leave because Prise continued to resist Alderwoods' decision to

accommodate requests from non-Jewish customers for Saturday visitations.  (Defs.' App.-Prise at

Tab 6 ¶¶ 22-23.)   When the context of Herman's alleged statement to Mizel is taken into

account, the statement could plausibly be understood to mean (and is most logically understood

to mean) not that Prise was *herself* "too Jewish," but that she was striving to make *Hirsch*

*Funeral Home* "too Jewish."  Prise cannot establish that Alderwoods was discriminating *against*

*her* simply by showing that it wanted her to operate *its funeral home* in a manner that was

contrary to Jewish customs.  Title VII prohibited Alderwoods from discriminating against Prise

because of *her* religious beliefs and practices, but does not require Hirsch Funeral Home or

Alderwoods to follow Prise's beliefs and practices.  *Wilson v. U.S. West Commc'ns*, 58 F.3d

1337, 1342 (8th Cir. 1995).  Therefore, Herman's alleged statement to Mizel does not qualify as

direct evidence of discrimination.

Since the record contains no direct evidence of discrimination, Prise's religion-based

discrimination claims must be analyzed under the *McDonnell Douglas-Burdine* framework.  In

order to shift the burden of production to Alderwoods, Prise must establish a prima facie case of

discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  The requirement that a plaintiff establish

a prima facie case of discrimination "is not intended to be onerous."  *Sempier v. Johnson &*

*Higgins*, 45 F.3d 724, 728 (3d Cir. 1995).  A prima facie showing raises an inference of

discrimination because the court presumes that the challenged actions, if left unexplained, were

"more likely than not based on the consideration of impermissible factors."  *Id.*  In determining

the proper elements of Prise's prima facie case, the court is mindful that the *McDonnell Douglas-*

*Burdine* analysis "was never intended to be rigid, mechanized, or ritualistic."  *Furnco Constr.*

*Corp. v. Waters*, 438 U.S. 567, 577 (1978).  Since the precise elements of a prima facie case

often depend on the nature of the particular factual dispute at issue, a "one-size-fits-all" approach

cannot be used in this context.  *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411 (3d Cir. 1999).

Instead, the elements of a prima facie case must be tailored to fit the specific context in which

they are applied. *Sarullo v. U.S. Postal Service*, 352 F.3d 789, 797-798 (3d Cir. 2003).

In order to establish a prima facie case of religion-based discrimination, Prise must show

that: (1) she was a member of a statutorily protected class (i.e., she was Jewish); (2) Alderwoods

took an adverse employment action (or multiple adverse employment actions) against her (i.e.,

Alderwoods "discharge[d]" her, or otherwise acted in a way which adversely affected her

"compensation, terms, conditions, or privileges of employment"), 42 U.S.C. § 2000e-2(a)(1); and

(3) Alderwoods' actions were taken under circumstances giving rise to an inference of religion-

based discrimination (i.e., Alderwoods' actions were taken under circumstances from which a

finder of fact could reasonably infer that such actions were taken "because of" Prise's "religion"

within the meaning of § 2000e-2(a)). *Id.* at § 2000e-2(a)(2).  While it is undisputed that Prise is

Jewish and satisfies the first element, the second and third elements are contested in this case.

Alderwoods contends that it took no adverse employment actions against Prise, and that none of

its actions with respect to Prise were taken under circumstances in which an inference of

religion-based discrimination could be drawn.  (Defs.' Mem. Mot. Sum. J.-Prise 11-13.)  Each of

these contested issues will be separately addressed.

### i)        Whether Alderwoods Took an Adverse Employment Action against Prise

Prise was placed on involuntary paid leave from September 29, 2005, through October

13, 2005.  (J.S.-Prise ¶ 41.)  She was again placed on involuntary paid leave on November 2,

2005, which continued until her employment with Alderwoods was terminated.  (*Id.* at ¶ 45.)

Relying on the decision of the United States Court of Appeals for the Second Circuit in *Joseph v.

Leavitt*, 465 F.3d 87 (2d Cir. 2006), Alderwoods argues that its decisions placing Prise on

31

involuntary paid leave did not constitute adverse employment decisions, since she continued to receive her salary during the relevant periods of time. (Defs.' Mem.-Prise 12.) (Docket No. 108.) In *Joseph*, the court of appeals held that an employer's decision placing an employee on paid administrative leave during the pendency of an investigation did not constitute an adverse employment action for purposes of Title VII. *Joseph*, 465 F.3d at 90-91. It was noted that "the terms and conditions of employment ordinarily include the possibility that an employee will be subject to an employer's disciplinary policies in appropriate circumstances," and that "an employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner." *Id.* at 91.

Prise counters Alderwoods' argument by pointing out that she was unable to obtain commissions for selling pre-need insurance policies while on paid leave. (Prise Mem. Resp. Defs.' Mot. 6-7.) (Docket No. 131.) The court does not understand Alderwoods to dispute this contention. Indeed, Alderwoods refutes Prise's Equal Pay Act claim by asserting that, because of Prise's commissions, her compensation was "significantly higher" than that of her fellow first-year location managers. (Defs.' Reply- Prise Resp. 3.) According to Alderwoods, Prise earned commissions at the rate of roughly $4,350.19 per year. (*Id.*) Because Alderwoods does not deny that Prise was unable to earn commissions during her leave periods, the court cannot accept its argument that the decisions placing Prise on involuntary paid leave did not constitute adverse employment decisions. *Joseph*, 465 F.3d at 92 ("We need not hold that suspensions during investigations will never rise to the level of an adverse employment action.").

32

Alderwoods contends that it never discharged Prise.  (Defs.' Mem.-Prise 12.)  According to Alderwoods, Prise's employment at Hirsch Funeral Home ended because she "voluntarily resigned" after accepting a new position at PIMS.  (*Id.*)  Prise argues that she never actually resigned, and that Alderwoods' personnel essentially forced her out by leaking false reports of her resignation to its employees and to members of the media.  (Prise Mem. Resp. Defs.' Mot. 17.)  Because the parties vehemently dispute this issue, a detailed examination of the evidence is required.

In her declaration, Leahy stated that Collins and she tentatively approved Prise's termination on September 23, 2005, due to Prise's unwillingness to cooperate with Alderwoods' decision to conduct the Baum visitation on a Saturday.  (Defs.' App.-Prise at Tab 6 ¶ 16.)   This initial decision to terminate Prise was subsequently abandoned.  (*Id.* ¶ 17.)  Leahy declared that she did not authorize an "involuntary termination" of Prise after September 2005, and that she approved a change in Prise's status only after learning from Harris that Prise submitted her resignation.  (*Id.* ¶¶ 24-25.)  In a declaration dated January 16, 2009, Harris stated that Mizel left him a voicemail message on the morning of November 15, 2005, informing him that Prise accepted a position at PIMS.  (*Id.* at Tab 58 ¶ 5.)  He declared that he proceeded to inform Collins, Leahy and Blute that Prise resigned from her position at Alderwoods.  (*Id.* ¶ 6.)  Harris claimed to have sent Mizel an email stating that Prise would soon receive her "final paycheck" from Alderwoods.  (*Id.* ¶ 7.)  On January 22, 2009, Ogrodnik executed a declaration in which he stated that Prise formally accepted a position with PIMS on November 14, 2005.  (*Id.* at Tab 56 ¶ 6.)

The declarations of Leahy, Harris and Ogrodnik are contradicted by other evidence contained in the record. In her first affidavit, Mizel stated that she told both Herman and Harris that Prise wanted to keep her job at Hirsch Funeral Home. (Pls.' J.A. at  Tab 16 ¶ 7.) She declared that Alderwoods *refused* to allow Prise to return to her duties. *Id.* In her supplemental affidavit, Mizel denied that she left Harris a voicemail message indicating that Prise accepted a position at PIMS. (*Id.* at Tab 36 ¶ 8.) Mizel stated that she told Harris that Prise could not afford to be out of work for a long period of time, and that Prise would have to accept a different job if Alderwoods was not going to retain her. (*Id.*) Mizel declared that Harris was nonresponsive to her inquiries about whether Alderwoods intended to return Prise to her position at Hirsch Funeral Home. (*Id.*) In a deposition conducted on April 16, 2008, Maizlech testified that Prise denied the accuracy of Alderwoods' announcement concerning her alleged resignation. (Pls.' J.A. at Tab 4; Maizlech Dep. 53, Apr. 16, 2008.) Maizlech's deposition testimony is corroborated by the text of a November 21, 2005, email to Amos, indicating that Prise denied rumors of her resignation. (Pls.' J.A. at Tab 21.) On March 31, 2008, Prise testified that she did not formally accept a position at PIMS until after learning that Alderwoods announced her resignation. (*Id.* at Tab 1; Prise Dep. 103-04, Apr. 2, 2008.) Prise described her November 15, 2005, email to Ogrodnik stating her intention to "wrap things up" at Hirsch Funeral Home as an attempt to stall for more time, hoping that Alderwoods would return her to Hirsch Funeral Home. (*Id.*)

In light of this conflicting evidence, the court concludes that there is a genuine issue of material fact concerning whether Prise was "discharged" within the meaning of Title VII. According to Mizel, Herman communicated Alderwoods' desire to negotiate a separation agreement with Prise as early as November 2, 2005. (Pls.' J.A. at Tab 16 ¶ 5.) When this

34

assertion is coupled with Mizel's subsequent claim that Harris was nonresponsive to her inquiries concerning Alderwoods' intentions for Prise's future at Hirsch Funeral Home, a reasonable finder of fact could conclude that Alderwoods had effectively decided to terminate Prise, and that Alderwoods' personnel were seeking to use Prise's pursuit of alternative employment options as a basis for claiming that she resigned.  In the constructive discharge context, the Supreme Court has recognized that an employee can be "discharged" within the meaning of Title VII even where no "official" action is taken by his or her employer.  *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004).  A jury would need to determine whether Prise was forced to resign because of a false announcement that she resigned, which arguably could be treated as a constructive discharge.  The court does not understand Alderwoods to argue that it would have returned Prise to her position at Hirsch Funeral Home if she had informed her superiors that she never intended to resign.  Consequently, Prise produced sufficient evidence to enable a reasonable finder of fact to determine that Alderwoods "discharged" her and thereby satisfied the second element of the prima facie inquiry.

**ii)   Whether the Alleged Discharge was under Circumstances Giving Rise to an Inference of Religion-based Discrimination.**

The prima facie inquiry does not end there.  In order to shift the burden of production to Alderwoods, Prise must show that the adverse employment actions taken against her (i.e., Alderwoods' acts of placing her on involuntary paid leave and "discharging" her) were taken under circumstances giving rise to an inference of unlawful discrimination.  *Burdine*, 450 U.S. at 253.  Such a showing would shift the burden of production to Alderwoods to "clearly set forth, through the introduction of admissible evidence, the reasons" behind its actions concerning Prise.

35

(*Id.* at 255.)  Prise would then be afforded an opportunity to demonstrate that the reasons given

by Alderwoods for its actions were merely a pretext for religion-based discrimination.  (*Id.* at

255-56.)  While these steps of the burden-shifting process are analytically distinct, they are not

mutually exclusive.  In *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358 (3d Cir. 2008), the

United States Court of Appeals for the Third Circuit observed:

> Lastly, it is important to remember that the *prima facie* case and pretext inquiries
> often overlap.  As our jurisprudence recognizes, evidence supporting the *prima
> facie* case is often helpful in the pretext stage, and nothing about the *McDonnell
> Douglas* formula requires us to ration the evidence between one stage or the other.

*Doe*, 527 F.3d at 370.  Evidence used to establish an employee's prima facie case may also serve

to discredit explanations given by his or her employer for the adverse employment action at

issue, and evidence introduced by an employer to explain the rationale for an adverse

employment action may likewise serve to weaken or defang an employee's prima facie case.

Whether summary judgment is appropriate in a particular case depends upon factors such as the

strength (or weakness) of the plaintiff's prima facie case, the probative value of the evidence put

forth by the employer to explain the reasons behind the challenged employment action, and the

probative value of the evidence presented by the plaintiff for the purpose of discrediting the

explanations posited by his or her employer.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530

U.S. 133, 148-49 (2000).

In this case, there is a significant overlap between the evidence presented by Prise and the

evidence presented by Alderwoods.  The same evidence is sometimes relied upon by both parties

in support of completely opposite propositions.  Given the present state of the record, it is

debatable whether Alderwoods' adverse employment actions against Prise were taken under

circumstances giving rise to an inference of religion-based discrimination.  For purposes of this

case, the court will assume *arguendo* that Prise can establish a prima facie case of discrimination,

thereby shifting the burden of production to Alderwoods.

**iii)     Alderwoods' Nondiscriminatory Reason**

In *Burdine*, the Supreme Court made the following observations about the burden of

production to show a nondiscriminatory reason:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of
> discrimination by producing evidence that the plaintiff was rejected, or someone
> else was preferred, for a legitimate, nondiscriminatory reason.  The defendant
> need not persuade the court that it was actually motivated by the proffered
> reasons. See [*Bd of Trs of Keene State Coll. v.*] *Sweeney*, [439 U.S. 24,] 25
> [(1978)].  It is sufficient if the defendant's evidence raises a genuine issue of fact
> as to whether it discriminated against the plaintiff.  To accomplish this, the
> defendant must clearly set forth, through the introduction of admissible evidence,
> the reasons for the plaintiff's rejection.  The explanation provided must be legally
> sufficient to justify a judgment for the defendant.  If the defendant carries this
> burden of production, the presumption raised by the prima facie case is rebutted,
> and the factual inquiry proceeds to a new level of specificity.  Placing this burden
> of production on the defendant thus serves simultaneously to meet the plaintiff's
> prima facie case by presenting a legitimate reason for the action and to frame the
> factual issue with sufficient clarity so that the plaintiff will have a full and fair
> opportunity to demonstrate pretext.  The sufficiency of the defendant's evidence
> should be evaluated by the extent to which it fulfills these functions.

*Burdine*, 450 U.S. at 254-56 (footnotes omitted).

With that in mind, the court turns to Alderwoods' proffered reasons for its actions against

Prise.  Viewing the evidence in the light most favorable to Prise, the court proceeds on the

assumption that Prise was "discharged" within the meaning of § 2000e-2(a).  The adverse

employment actions taken against Prise constituted the imposition of two involuntary paid

leaves, the second of which continued until the date of her termination.  Because Prise did not

return to work at Hirsch Funeral Home after the beginning of her second leave period, the court will treat her second paid suspension as the same event as her "discharge."

In her declaration, Leahy stated that Prise told Blute that Hirsch Funeral Home could not accommodate the Baum family's request for a Saturday visitation because doing so would drive away Jewish business.  (Defs.' App.-Prise at Tab 6 ¶ 15.)  According to Leahy, Collins and she approved Prise's termination on September 23, 2005, because of Prise's unwillingness to cooperate with her superiors' decision to move forward with the Saturday visitation.[8]  (*Id.* ¶ 16.)  This decision was later reconsidered, and Prise was given a warning letter instead of a termination notice.  (*Id.* ¶ 17.)  Leahy declared that, after Prise was warned not to resist Alderwoods' management decisions, several rabbis from the Pittsburgh area sent letters to Alderwoods' personnel threatening to urge the members of their congregations to boycott Hirsch Funeral Home if it did not adhere to Jewish customs and protocols.  (*Id.* ¶ 18.)

The letters from Rabbi Kaminsky and Rabbi Berkun are included within the record.  (*Id.* at Tab 46.)  Also included within the record is an email from Rabbi Bisno to Amos.  (*Id.*)  All three of these communications included expressions of support for Prise's efforts to conform Hirsch Funeral Home's practices to Jewish law.  (*Id.*)  Rabbi Berkun's letter was dated September 27, 2005, and Rabbi Bisno's email to Amos was sent on the evening of September 28, 2005.  (*Id.*)  Although the letter from Rabbi Kaminsky was undated, it is apparent that all these communications were sent to Alderwoods in the immediate aftermath of the Baum visitation, which was conducted on Saturday, September 24, 2005.

---

[8]Prise's own EEOC charge supports Alderwoods' contention that Prise was insubordinate.  In her general intake questionnaire, Prise stated that she had instructed Hilgefort "to reschedule the Saturday visitation at the funeral home's expense."  (Pls.' J.A. at Tab 18.)

The record also includes an email from Prise to Leahy dated September 29, 2005. (*Id.* at Tab 47.) In that email, Prise stated that she wanted to "discuss damage control regarding the current situation," and that she had "some ideas" that could be implemented to "effectively remedy the situation." (*Id.*) Leahy explained in her declaration that Prise insisted that Alderwoods apologize to the Jewish community in order to avoid the boycott which had been threatened by the rabbis. (*Id.* at Tab 6 ¶ 18. Leahy evidently told Prise that Alderwoods would work to accommodate the needs of customers of all religious backgrounds, and that further acts of insubordination would not be tolerated. (*Id.* ¶ 19.) At that point, Leahy apparently instructed Prise to take two weeks off in order to "cool down and recommit herself to her job." (*Id.* ¶ 20.)

Leahy's declaration concerning Prise's resistance to Alderwoods' decision to accommodate the Baum family is corroborated by other evidence in the record. In a deposition conducted on May 2, 2008, Amos testified that Prise started to yell at him irrationally after learning that the Baum visitation would be conducted on a Saturday. (Pls.' J.A. at Tab 7; Amos Dep. 125-26, May 2, 2008.) On April 17, 2008, Hilgefort testified that Prise was upset about Alderwoods' decision to accommodate the request of the Baum family. (Pls.' J.A. at Tab 6; Hilgefort Dep. 90, Apr. 17, 2008.) In light of the testimonial and documentary evidence contained in the record, it is clear that Alderwoods satisfied its burden of production with respect to Prise's first paid suspension.

Prise was placed on involuntary paid leave again on November 2, 2005, and she never returned to her job at Hirsch Funeral Home. In a declaration dated January 21, 2009, McDermott stated as follows:

6.      I held a staff meeting on November 2, 2005 at Brandt.  During the meeting, Deborah Prise stated that all services at the Hirsch Funeral Home were prohibited during the Jewish Sabbath and Jewish holidays.  I reminded Prise that management had decided Hirsch should serve families on those days and that a staff meeting was not the time to discuss the operating hours at Hirsch.  Prise began to yell and said that she was going to attend the Rabbinical Council and urge the rabbis to boycott Hirsch unless it agreed to close on the Jewish Sabbath and Jewish holidays.

7.      Heather Rady then began yelling that if Hirsch was closed on the Sabbath and Jewish holidays, then Christian funeral directors should not have to work on Christmas.  I again tried to defuse the situation by stating that this was not the time for such a discussion.

8.      Prise and Rady then engaged in a heated argument about Jewish and Christian faiths and whether all employees should have holidays off.  The atmosphere in the meeting became very tense, and both Prise and Rady spoke in heated, angry voices.  The meeting eventually dissolved because Prise and Rady ignored my attempts to control the situation.

9.      Afterwards, I informed Randy Amos of the events that occurred at the staff meeting and the tension created by Prise's refusal to abide by management's decision regarding operating hours.  I also informed Amos that Prise intended to urge local rabbis, again, to boycott Alderwoods if Hirsch did not change its operating schedule.

(Defs.' App.-Prise at Tab 10 ¶¶ 6-9.)  In her declaration, Leahy stated that she feared that Prise's "disruptive behavior, including the possibility of a renewed public campaign against Alderwoods, would damage business at Hirsch."  (*Id.* at Tab 6 ¶ 22.)  Leahy declared that Collins and she decided to place Prise on a temporary paid leave while Alderwoods personnel decided how to resolve the dispute concerning Saturday operations at Hirsch Funeral Home.  (*Id.* ¶ 23.)  This evidence is sufficient to satisfy Alderwoods' burden of production with respect to Prise's second paid suspension.  As noted earlier, because Prise's second paid suspension essentially

ended with her termination, it is clear that Alderwoods' proffered reasons for placing Prise on leave were its reasons for "discharging" her.[9]

### iv)   Pretext

The next stage of the *McDonnell Douglas* framework is the shifting burden to plaintiff to show pretext.  In order to defeat Alderwoods' motion for summary judgment with respect to her disparate treatment claims, Prise must persuade the court that a reasonable trier of fact could conclude that she was the victim of religion-based discrimination.  She can do so either directly by showing that a discriminatory animus most likely motivated Alderwoods or indirectly by showing that Alderwoods' proffered reasons for its actions are unworthy of credence.  *Burdine*, 450 U.S. at 256.  She argues that she can do both, but neither argument is persuasive.

The court must address whether plaintiff can demonstrate that defendants' stated reasons for her termination were a pretext for religion-based discrimination.  The United States Court of Appeals for the Third Circuit has developed the following two-prong test (the "*Fuentes* test") that a plaintiff must meet to show pretext:

> [T]o defeat summary judgment when the [employer] [articulates] legitimate non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

---

[9]Because Alderwoods denies that Prise was involuntarily terminated, it did not offer reasons for "discharging" Prise.  Mizel asserted in both of her affidavits that Herman communicated Alderwoods' desire to negotiate a separation agreement with Prise on November 2, 2005.  (Pls.' J. A. at Tabs 16 ¶ 6, 36 ¶ 6.)  That was the same day that Prise was placed on involuntary paid leave.  Viewing the evidence in the light most favorable to Prise, the court proceeds on the assumption that Alderwoods' essentially "discharged" Prise at that time.

*Fuentes v. Perskie*, 32 F.3d 759, 764; *see Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008) ("Put another way, to avoid summary judgment the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, that the proffered reason is a pretext).").  The two prongs of the *Fuentes* test are distinct.  The court will analyze both prongs of the *Fuentes* test to determine whether sufficient evidence was presented by plaintiff to defeat defendant's motion for summary judgment.  *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-13 (3d Cir. 1997) (analyzing ADEA action under both prongs of *Fuentes* framework).

### 1.    Prong one of *Fuentes* test

Prong one of the *Fuentes* test focuses on whether plaintiff submitted evidence from which a fact-finder could reasonably disbelieve the defendants' articulated legitimate reasons for the plaintiff's termination.  Under this prong, the plaintiff must point to:

> weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action.

*Simpson,* 142 F.3d at 644.  The district court under this prong must focus on the legitimate, nondiscriminatory reason offered by the employer.  *Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992) (stating that a "plaintiff does not establish pretext, however, by pointing to criticisms of members of the non-protected class, or commendation of

42

the plaintiff, in categories the defendant says it did not rely upon.").  The court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is evidence of discrimination.  *Id.* at 527.

Cases analyzed under this prong usually survive a motion for summary judgment when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it.  For example, in *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326 (3d Cir. 1995), the plaintiff was terminated for deficient sales performance.  The evidence of record, however, disclosed that the plaintiff received a bonus three months before he was fired and that he was the only sales representative in the region who had received such a bonus.  *Id.* at 329. The court held that, where the primary measure of the plaintiff's performance was sales and he was the leading salesperson in the region, his employer's stated reason for his termination was contradictory to its admission that the most important standard of job performance is sales.  *Id.* at 332.  According to the court, "[a] fact-finder could find it implausible that [the employer] would have fired [the plaintiff] for such deficiencies when he was successful in the sole area identified by [the employer]'s own performance incentive program - sales."  Id.

Similarly, in *Sempier v. Johnson and Higgins*, 45 F.3d 724 (3d Cir. 1995), the employer stated that Sempier was terminated based upon poor performance that caused the company to restructure the nature of his responsibilities.  The evidence of record, however, disclosed that 1) Sempier never received any unfavorable criticism that his performance was poor or inadequate; and 2) the employer failed to produce any other evidence of poor performance or to make specific allegations of Sempier's deficiencies.  *Id.* at 731-33.  Thus, there was evidence on the

record that a reasonable fact-finder could conclude that the reason given by Sempier's employer

was a pretext for age discrimination.  *Id.* at 732-33.

It is not the function of this court to determine whether defendants' business judgment in

terminating plaintiff was correct.  In *Watson v. Southeastern Pennsylvania Transportation

Authority*, 207 F.3d 207 (3d Cir. 2000), the Court of Appeals for the Third Circuit explained that

an employer is permitted "to take an adverse employment action for a reason that is not 'true' in

the sense that it is not objectively correct."  *Id.* at 222.  As an example, the court of appeals

stated:

> if an employer sincerely believes that an employee has stolen
> company funds and discharges the employee for this reason, the
> employer should not be held liable under the [employment
> discrimination statutes in question] just because it turns out that the
> employee did not steal the funds and that the employer's reason for
> the discharge was in this sense not "true."

*Id.*  The inquiry must focus upon "the perception of the decision maker."  *Billet v. Cigna Corp.*,

940 F.2d 812, 825 (3d Cir. 1991).  Defendants only needed an honest belief that the incidents

occurred.  *Watson*, 207 F.3d at 222.

Attempting to show that Alderwoods' personnel were motivated by an anti-Semitic

animus, Prise recites a litany of instances in which her superiors and co-workers rebuffed her

attempts to operate Hirsch Funeral Home in conformity with Jewish law.  (Prise Mem. Resp.

Defs.' Mot. 10-12.)  None of the described events (all but one of which are unsupported by

citations to the record) involved Leahy or Collins, who actually made the personnel decisions

about which Prise complains.  (*Id.*)  The court already noted that Alderwoods' exercise of its

prerogative to operate Hirsch Funeral Home in the manner of its choosing cannot reasonably be

44

construed as reflective of an anti-Semitic animus *against Prise*.  The only circumstance

referenced by Prise that warrants discussion is her claim that Maizlech was asked questions about

her religious beliefs during Maizlech's interview with Mr. Hirsch.  Such questions could, under

some circumstances, permit an inference to be drawn that an employer engaged in improper

religion-based discrimination.  In this instance, however, no such inference can be drawn.

Maizlech, who is Jewish, testified that she had been asked questions about the religious beliefs of

her husband and her by Mr. Hirsch, who is also Jewish, during her interview.  (Pls.' J.A. at Tab

4; Maizlech Dep. 47-48, Apr. 16, 2008.)  According to Maizlech, Prise "profusely" apologized to

her after the interview for Mr. Hirsch's questions about her religious background.  (*Id.*)

Maizlech, of course, was ultimately hired for the position that she was seeking.  It is difficult to

fathom how a reasonable trier of fact could infer from the questions asked of Maizlech by Mr.

Hirsch, that Alderwoods personnel were somehow making decisions on an anti-Semitic basis.

To the contrary, the questions in issue, when in the context of questioning by Mr. Hirsch, reflect

a desire to hire employees who are Jewish, a pro-Semitic basis.    To the extent that Prise argues

that McDermott was anti-Semitic, the court finds her argument unpersuasive.  Although Mr.

Hirsch testified that his "core feeling" was that McDermott had an anti-Semitic "attitude," he

could point to no specific evidence to buttress his "feeling."  (Pls.' J.A. at Tab 3; Hirsch Dep. 20,

May 13, 2008.)  There is nothing in the record giving rise to an inference that Alderwoods

suspended and terminated Prise *because she was Jewish*.

Prise did not present evidence which calls into question Alderwoods' proffered reasons

for suspending her.  Indeed, her deposition testimony actually provides evidentiary support for

those reasons.  On April 2, 2008, Prise acknowledged that she contacted rabbis shortly after

receiving Amos' warning letter of September 26, 2005.  (Pls.' J.A. at Tab 1; Prise Dep. 178-83, Apr. 2, 2008.)  She expressly stated that she hoped that the rabbis "could provide communications with management" in order to facilitate her observance of the Jewish Sabbath and holy days. (Pls.' J.A. at  Tab 1; Prise Dep. 178.)  Although she denied that she encouraged the rabbis to boycott Hirsch Funeral Home, she testified that she informed Rabbi Kaminsky, the head of the Rabbinical Council, about the situation after consulting with her own rabbi.  (Pls.' J.A. at  Tab 1; Prise Dep. 181.)  Her communications with rabbis in the Pittsburgh area apparently led the rabbis to send letters to Alderwoods personnel threatening to boycott Hirsch Funeral Home if it did not operate in accordance with Jewish customs.  Prise denied that the boycott was her idea, but she acknowledged that the letters from the rabbis came as a direct result of her complaints.  (Pls.' J.A. at  Tab 1; Prise Dep. 178-83.)

Leahy claimed in her declaration that Prise warned her that a refusal by Alderwoods to apologize to the Jewish community for its actions concerning the Baum visitation could lead area rabbis to boycott Hirsch Funeral Home.  (Defs.' App.-Prise at Tab 6 ¶ 18.)  This proposed apology may have been among the "ideas" referenced in Prise's September 29, 2005, email to Leahy, in which she expressed an interest in discussing "damage control."  (*Id.* at Tab 47.)  Prise's testimony did not contradict Leahy's declaration.  Instead, Prise simply testified that she did not specifically remember what she had said to Leahy.  (Pls.' J.A. at Tab 1; Prise Dep. 182-83.)  Because this portion of Leahy's declaration is uncontradicted, no reasonable trier of fact could conclude other than that Prise warned Leahy that a boycott of Hirsch Funeral Home could ensue if Alderwoods did not issue a public apology to the Jewish community for its violations of

Jewish law, and that this conversation between Prise and Leahy precipitated Prise's first paid suspension.

Prise testified that she could not remember what had been said at the staff meeting of November 2, 2005.  (Pls.' J.A. at Tab 1; Prise Dep. 174-75.)  She stated that the meeting was "tense and unfriendly."  (Pls.' J.A. at Tab 1; Prise Dep. 175.)  She testified that Johnson and McDermott informed her that she was being placed on leave until the matters raised in her EEOC charge could be resolved.  (Pls.' J.A. at Tab 1; Prise Dep. 172.)  While such testimony may buttress Prise's claims under the antiretaliation provisions of Title VII and the PHRA, it provides no support for her assertion that she was suspended (and ultimately "discharged") *because of her religion*.

### 2.    Prong two of *Fuentes* test

The court is next required to examine the second prong of the *Fuentes* framework to determine if plaintiff presented sufficient evidence of pretext.  This prong permits the plaintiff to survive summary judgment if she can demonstrate, through evidence of record, that "discrimination was more likely than not a motivating or determinative cause of the adverse employment action."  *Fuentes,* 32 F.3d at 762.  With respect to this prong, the United States Court of Appeals for the Third Circuit has stated:

> To show that discrimination was more likely than not a cause for the employer's action, the plaintiff must point to evidence with *sufficient probative force* that a factfinder could conclude by a preponderance of the evidence that age was a motivating or determinative factor in the employment decision.

*Simpson*, 142 F.3d at 644-45 (3d Cir. 1998) (emphasis added).  The kinds of evidence relied upon by the court of appeals under this prong of the *Fuentes* analysis are: 1) whether the

47

employer previously discriminated against the plaintiff; 2) whether the employer has discriminated against other persons within the plaintiff's protected class or within another protected class; and 3) whether the employer has treated more favorably similarly situated persons not within the protected class.  *Id.*  The court will examine whether plaintiff submitted that kind of evidence.

### a.)       Evidence of Previous Discrimination Against Plaintiff

Prise did not present any evidence that defendants had previously discriminated against her.  Therefore, no reasonable finder of fact could conclude that defendants previously discriminated against her.

### b.)       Whether the Employer Discriminated Against Other Persons in Plaintiff's Protected Class or Another Protected Class

The only evidence that defendants discriminated against other persons in Prise's protected class or another protected class that is addressed in the record is the alleged retaliation against Rady, which as will be discussed, a reasonable jury could not find to be discriminatory conduct. Therefore, no reasonable finder of fact could conclude that defendants previously discriminated against other person's in Prise's protected class or another protected class.

### c.)       Whether Employer Treated More Favorably Similarly Situated Persons Not Within the Protected Class

Prise did not present any evidence that defendants more favorably treated similarly situated persons who were not Jewish, the protected class.  Therefore, no reasonable fact-finder could determine that defendants more favorably treated similarly situated persons not within the protected class.

In light of the foregoing analysis, no reasonable jury could conclude that Alderwoods treated Prise adversely because she was Jewish.  Accordingly, Alderwoods' motion for summary judgment will be granted with respect to Prise's religion-based discrimination claims under Title VII and the PHRA to the extent that such claims are based on a "disparate treatment" theory.

**b.      Failure to Accommodate**

Prise's filings make clear that she is asserting "failure to accommodate" claims under Title VII and the PHRA in addition to her "disparate treatment" claims.  These claims are based on Alderwoods' alleged refusal to permit Prise to miss work on Saturdays in order to observe the Jewish Sabbath.  (Third. Am. Compl. ¶¶ 68, 76.) (Docket No. 84.)  As noted earlier, 42 U.S.C. § 2000e(j) defines the term "religion" broadly enough to include "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to *reasonably accommodate* to an employee's or prospective employee's religious observance or practice without *undue hardship* on the conduct of the employer's business."  42 U.S.C. § 2000e(j)(emphasis added).  Under this definition, a covered employer's failure to accommodate reasonably the religious practices of an employee can constitute religion-based "discrimination" within the meaning of § 2000e-2(a).

The phrases "reasonably accommodate" and "undue hardship," when employed in the Title VII context, do not impose on employers the heightened standards applicable under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*[10]  Courts have recognized that Title VII's religious accommodation requirement is not as demanding as the

---

[10]The ADA defines the term "reasonable accommodation" broadly enough to include "job restructuring" and "part-time or modified work schedules."  42 U.S.C. § 12111(9)(B).  The term "undue hardship" is defined in the ADA as "an action requiring significant difficulty or expense," when considered in light of several statutorily enumerated factors.  42 U.S.C. § 12111(10)(A).

accommodation requirement provided to disabled employees and applicants under the ADA.

*Harter v. Univ. of Indianapolis*, 5 F. Supp.2d 657, 661 (S.D.Ind. 1998); *Eckles v. Consol. Rail Corp.*, 890 F. Supp. 1391, 1405-08 (S.D. Ind. 1995).  The proper construction of § 2000e(j) has its genesis in *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 66 (1977).  In *Hardison* the Supreme Court applied an EEOC regulation that was the precursor to § 2000e(j).  The Supreme Court concluded that an employer would suffer an "undue hardship" under Title VII if it had to incur more than a *de minimis* expense in order to permit an employee to miss work on Saturdays for religious reasons.  *Hardison*, 432 U.S. at 84.  The Supreme Court stated:

> As we have seen, the paramount concern of Congress in enacting Title VII was the elimination of discrimination in employment.  In the absence of clear statutory language or legislative history to the contrary, we will not readily construe the statute to require an employer to discriminate against some employees in order to enable others to observe their Sabbath.

*Id.* at 85.  Relying on *Hardison*, courts have consistently held that Title VII does not require an employer to force other employees to work on a particular day in order to accommodate a specific employee's desire to observe a religious holiday or Sabbath.  *Vaughn v. Waffle House, Inc.*, 263 F. Supp.2d 1075, 1085 (N.D. Tex. 2003); *EEOC v. Bridgestone/Firestone, Inc.*, 95 F. Supp.2d 913, 924 (C.D. Ill. 2000); *Moore v. A.E. Staley Mfg. Co.*, 727 F. Supp. 1156, 1162-63 (N.D. Ill. 1989); *EEOC v. Carbie Hilton Int'l*, 597 F. Supp. 1007, 1013 (D. P.R. 1984).

Prise was evidently led to believe that she had an absolute statutory right to refuse to work on the Jewish Sabbath.  (Defs.' App.-Prise at Tab 49.)  This belief was in error.  Neither Title VII nor the PHRA provides an employee with an absolute, unqualified right to be free from discipline for refusing to work on his or her chosen day for religious observance.  Title VII's religious accommodation requirement has been deemed to be constitutionally permissible

50

precisely because it does *not* require covered employers to accommodate an employee's chosen

religious observances in any and all circumstances.  *Estate of Thorton v. Caldor, Inc.*, 472 U.S.

703, 712 (1985) (O'Connor, J., concurring) ("Since Title VII calls for reasonable rather than

absolute accommodation and extends that requirement to all religious beliefs and practices rather

than protecting only the Sabbath observance, I believe an objective observer would perceive it as

an anti-discrimination law rather than an endorsement of religion or a particular religious

practice.").  In order to withstand constitutional scrutiny, a religious accommodation statute must

be "measured so that it does not override other significant interests."  *Cutter v. Wilkinson*, 544

U.S. 709, 722 (2005).  For this reason, Congress expects federal religious accommodation

statutes to be "applied in an appropriately balanced way."  *Id.*  The court also notes that while the

PHRA contains a provision expressly addressing the right of an individual employed by "the

State or any of its political subdivisions" to refrain from working on his or her Sabbath of choice,

it contains no similar provision addressing the right of an individual employed by a private entity

to do so.  43 PA. STAT. § 955.1(a)-(b).  Since Alderwoods was a private entity, it was subject

only to the PHRA's general prohibition against discrimination based on an employee's "religious

creed."  43 PA. STAT. § 955(a).  Such a general prohibition against religion-based discrimination

cannot be reasonably construed to mean that covered employers must always permit their

employees to refrain from working on particular religious Sabbaths or holy days.  *Hardison*, 432

U.S. at 85.  To the extent that Prise believed that Title VII and the PHRA provided her with

absolute protection from employer discipline for refusing to work on Saturdays, she was

mistaken.

Although Title VII's *de minimis* "undue hardship" standard has often led courts to reject claims brought by employees seeking to miss work on a particular day of the week for religious reasons, the United States Court of Appeals for the Third Circuit has held that an employee's request for a guarantee that he or she will never have to work on his or her Sabbath of choice invokes an employer's statutory duty to accommodate. *Protos v. Volkswagen of Am., Inc.*, 797 F.2d 129, 134 (3d Cir. 1986). An employee can prevail in a Sabbath-based accommodation action by showing that his or her employer could have provided him or her with an appropriate accommodation without bearing more than a *de minimis* cost. *Id.* at 134-35.

In order to establish a prima facie "failure to accommodate" case under Title VII, an employee must show that: (1) he or she held a sincere religious belief, or adhered to a specific religious observance or practice, that precluded him or her from fulfilling a particular job-related requirement; (2) he or she informed his or her employer about the conflict between the religious belief, observance or practice and the job-related requirement; and (3) the employer imposed discipline on him or her because of his or her failure to fulfill the job-related requirement at issue. *Webb v. Phila.*, 562 F.3d 256, 259 (3d Cir. 2009). Once a prima facie case has been established, the burden shifts to the employer to show *either* that it has provided the employee with a reasonable accommodation for his or her religious belief, observance or practice *or* that such an accommodation has not been provided because it would require the employer to endure an "undue hardship" within the meaning of § 2000e(j). *EEOC v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008). An employer is not statutorily required to offer an employee his or her *preferred* accommodation in circumstances where a *sufficient* accommodation has already been provided. *Ansonia Bd. Educ. v. Philbrook*, 479 U.S. 60, 68-69

(1986) ("Thus, where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end.  The employer need not further show that each of the employee's alternative accommodations would result in undue hardship.").  In determining whether an adequate accommodation would impose an undue hardship on an employer, a court must focus on the "specific context" of the case at issue, accounting for both the *fact* and the *magnitude* of the alleged undue hardship.  *Webb*, 562 F.3d at 260.  Both economic and noneconomic costs can impose undue hardships on employers.  *Id.*  Although the varied applications of the "undue hardship" standard make it difficult to define with a large degree of precision, the applicable judicial precedents make clear that it is not a difficult threshold for an employer to surmount.  *United States v. Bd. of Educ. Sch. Dist. of Phila.*, 911 F.2d 882, 890 (3d Cir. 1990).

Although Alderwoods attacks the sincerity of Prise's assertion that it was contrary to her religious beliefs to work on Saturdays, there is sufficient evidence in the record to defeat that argument for purposes of summary judgment.  Prise testified that while she had been willing to respond to a need for immediate action on a Saturday, she had never been comfortable with backing up employees at Brandt Funeral Home who regularly worked on Saturdays.[11]  (Pls.' J.A. Resp. Defs.' Mot. Sum. J. at Tab 1; Prise Dep. 43-47.)  In order to establish her prima facie case, however, Prise must also show that she informed Alderwoods of a job-related requirement that

---

[11] The record contains a declaration from Johnson stating that Prise drove the lead car in a funeral procession from Brandt Funeral Home to a cemetery on Saturday, September 10, 2005.  (Second Supplemental Decl. of Peter Johnson ¶ 7.)  This procession occurred just two weeks before the Baum visitation.  Alderwoods contends that Prise's objection to working on Saturdays applied only to Hirsch Funeral Home, since her concern was appealing to the Jewish community; rather than accommodating her own religious observances.  (Defs.' Reply -Prise Resp.  5-7.)

conflicted with her religious beliefs, and that she was disciplined for failing to fulfil that requirement.  *Webb*, 562 F.3d at 259.

The record indicates that Prise communicated her need to observe the Jewish Sabbath to Alderwoods personnel on September 22, 2005, shortly after learning that the Baum visitation would proceed as scheduled.  On May 2, 2008, Amos testified that Prise accused him of encroaching upon her religious freedom by forcing her to work on the Sabbath, and that he responded by instructing her to take that day off.  (Pls.' J.A. at Tab 7; Amos Dep. 126-27.) Amos' notes indicate that he informed Prise that she would not need to work on Saturday, September 24, 2005.  (Defs.' App.-Prise at Tab 33.)  Prise's own record of her deliberations with Amos included the following notation:

> Thurs, Sept 22 AM-Randy Amos decided visit to go on as scheduled by Hilgefort but told me he would tend to staffing concerns and not to worry.

(*Id.* at Tab 36.)  Prise apparently stopped at Hirsch Funeral Home on the day of the visitation, although it is not entirely clear why she did so.  Hilgefort testified that Prise was there on that day, but that he handled the visitation.  (Pls.' J.A. at Tab 6; Hilgefort Dep. 87-89.)  Hilgefort was not scheduled to work on that day, but he went to Hirsch Funeral Home so that Prise would not be forced to handle the visitation.  *Id.*

In the joint statement of facts relative to her motion for partial summary judgment, Prise claims that Amos told her as early as September 22, 2005, that she would have to work on a Jewish holy day or Sabbath if a customer were to request service on such a day.  (J.S. Pls.' Mot. Partial Sum. J. ¶ 35.)  In support of her assertion, Prise cites her own deposition testimony, as well as that of Hilgefort and Amos.  *Id.*  The cited portions of the testimonial record, however, do not support Prise's contention.  Prise testified that Amos told her, during her last staff meeting,

that it was her duty to provide service to customers whenever they desired it, even when doing so would require her to work on a Jewish holy day.  (Pls.' J.A. at Tab 1; Prise Dep. 71-74.)  She testified that the meeting occurred in October 2005, but the meeting referenced in her testimony appears to have been the staff meeting of November 2, 2005.  In any event, the meeting discussed in the cited portions of Prise's deposition testimony was definitely not conducted on September 22, 2005.  The cited portions of Hilgefort's deposition testimony relate not to Prise's request for an accommodation for herself, but rather to her request that the Baum visitation *itself* be rescheduled.  (Pls.' J.A. at Tab 6; Hilgefort Dep. 90-91.)  The portions of Amos' deposition transcript cited by Prise relate to the September 26, 2005, meeting between Prise, Amos and Sanders, not to a meeting conducted before the Baum visitation.  (Pls.' J.A. at Tab 7; Amos Dep. 130-32.)  Hence, the record does not support Prise's contention that she was instructed *before* the Baum visitation that she would have to work on the Jewish Sabbath, or on a Jewish holy day, if she were to be asked to do so.[12]

Although Prise evidently went to Hirsch Funeral Home on the day of the Baum visitation, the record is devoid of evidence that she was *forced* to do so.[13]  Prise testified that she had been

---

[12]Prise's attempt to incorporate by reference her pleadings and briefs into a sworn affidavit is unavailing. (Pls.' J.A. Resp. Defs.' Mot. Sum. J. at Tab 2.)  Some assertions contained in her statements of fact appear to be in conflict with her own deposition testimony.  *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 251 (3d Cir. 2007).

[13]In her EEOC charge, Prise stated as follows:
Because of my concerns that matters at the funeral home be handled properly, despite my misgivings about the timing of the visitation and my own religious beliefs, I left my customary Sabbath services to pick up cremated remains and death certificates for the Baum family, assist with the setup, and assist with flower deliveries.  Funeral Director Hilgefort remarked to me, in front of Justin Huntsman, a student who assists at the home, that I seemed willing to work on Saturday for a Jewish family, a statement Mr. Amos echoed sometime later.  This remark was a complete misrepresentation of the situation, which was not of my making but was indeed created contrary to my direct instructions.  I appeared at the funeral home that day, under duress, only to ensure that the family whose contract had been accepted for that Sabbath day, contrary to my instructions, did not suffer inadequate service as a result.
(Pls.' J.A. at Tab 18.)

told by Amos at a staff meeting that she would have to work on a Jewish holy day if that were to

be asked of her, but there is no evidence in the record indicating that she was ever asked to work

on such a day.  (Pls.' J.A. at Tab 1; Prise Dep. 71-74.)  Sanders' notes from the September 26,

2005, meeting among Amos, Prise and her indicate that while Prise was told by Amos that

*Hirsch Funeral Home* would accommodate requests for Saturday visitations, Prise was never told

that *she* would have to work during such visitations.  (Defs.' App.-Prise at Tab 42.)    While Prise

may dispute Sanders' characterization of that meeting, she does not claim that she was ever

*required* to work on a Jewish holy day or Sabbath, or that she was ever *disciplined* for refusing to

do so.  The evidence of record overwhelmingly indicates that Prise was disciplined for her

resistance to Alderwoods' decisions concerning the operations at *Hirsch Funeral Home*.  This

evidence does not support Prise's assertion that Alderwoods was discriminating *against her* for

purposes of Title VII and the PHRA.  At worst, Prise's testimony (if believed by a trier of fact)

could establish that Alderwoods could not give her an absolute guarantee that she would never be

expected to work on the Jewish Sabbath or on a Jewish holy day.  As noted earlier, Title VII and

the PHRA did not entitle Prise to such an ironclad guarantee.[14]  Indeed, such an unqualified

guarantee cannot constitutionally be required by law.  *Estate of Thornton*, 472 U.S. at 710-711

---

Despite Prise's use of the word "duress," it is clear from the context of her comments that no reasonable jury could find she was  *compelled*  to work on the date of the Baum visitation.

[14]Under *Protos v. Volkswagen of America, Inc.*, 797 F.2d 129, 134 (3d Cir. 1986), an employee's request for an absolute guarantee that he or she will never have to work on a designated Sabbath invokes Title VII's duty to accommodate.  This case is distinguishable from  *Protos*, however, in that Prise was never told that she had to work on a particular Sabbath or holy day; whereas, the plaintiff in  *Protos* was progressively disciplined (and ultimately discharged) for failing to appear for work on several Saturdays.  *Protos*, 797 F.2d at 132.  While an employer may reasonably be expected to accommodate an employee (or to articulate an "undue hardship" defense) under known circumstances, it would be unreasonable to expect Alderwoods to accommodate Prise's request for contingency plans (or to establish its "undue hardship" defense) based solely on hypothetical scenarios.  The burden does not shift to the employer until after the employee has established a prima facie case of religion-based discrimination.  *Webb v. Phila.*, 562 F.3d 256, 259 (3d Cir. 2009).

("We hold that the Connecticut statute, which provides Sabbath observers with an absolute and unqualified right not to work on their Sabbath, violates the Establishment Clause of the First Amendment.").

The accommodation requirements contained in Title VII and the PHRA are appropriately "measured so that [they do] not override other significant interests." *Cutter*, 544 U.S. at 722. Their applications are often fact-specific. An employer's duty to accommodate cannot arise until an actual conflict between a religious belief, observance or practice and a job-related requirement is actually presented. *Wilkerson v. New Media Tech. Charter Sch., Inc.*, 522 F.3d 315, 319-20 (3d Cir. 2008). That point was never reached in this case. Accordingly, Alderwoods is entitled to summary judgment with respect to Prise's religion-based discrimination claims under Title VII and the PHRA because no reasonable jury could render a verdict in her favor with respect to this claim. While Prise may have been sincerely offended by Alderwoods' decision to operate Hirsch Funeral Home in a manner that she deemed to be inconsistent with Jewish customs, she enjoyed no statutory right to impose her own religious beliefs on her employer.[15] *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607-08 (9th Cir. 2004); *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1021 (4th Cir. 1996).

---

[15] For most of its history, Hirsch Funeral Home belonged to the Jewish Funeral Directors Association of America ("JFDA"). Mr. Hirsch was apparently the president of the JFDA at one time. (Defs.' Mem. Mot. Sum. J.-Prise 1.) Maizlech testified that Hirsch Funeral Home's membership in the JFDA was not renewed for the year 2008. (Pls.' J.A. at Tab 4; Maizlech Dep. 39-40.) Alderwoods apparently decided that Hirsch Funeral Home did not need to be operated in strict conformity with Jewish law. Prise argues that Alderwoods terminated her because *she* was "too Jewish." (Prise Mem. Resp. Defs.' Mot. Sum. J. 13.) The record reflects that Alderwoods suspended (and arguably terminated) Prise due to her insistence that *Hirsch Funeral Home* comply with Jewish customs and practices.

57

2.      **Retaliation**

Prise asserts claims against Alderwoods under the antiretaliation provisions of Title VII

and the PHRA.  (Third Am. Compl. ¶¶ 72-73, 80-81.)  Prise and Alderwoods filed cross-motions

for summary judgment with respect to these claims.  Title VII's antiretaliation provision, which

is codified at 42 U.S.C. § 2000e-3(a), provides:

> **§ 2000e-3.  Other unlawful employment practices**
>
> **(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings.**  It shall be an unlawful employment practice for any employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter [VI. Equal Employment Opportunities], or because he has made a charge, testified, assisted, or participated *in any manner* in an investigation, proceeding, or hearing under this title [42 U.S.C. §§ 2000e-2000e-17].

42 U.S.C. § 2000e-3(a).  The first clause of § 2000e-3(a) is known as the "opposition clause,"

while the second clause of this statute is known as the "participation clause."  *Crawford v. Metro.*

*Gov't of Nashville & Davidson County*, 129 S. Ct. 846, 850 (2009).

The PHRA contains its own antiretaliation provision, which contains opposition and

participation clauses similar to those contained in § 2000e-3(a).  The PHRA's antiretaliation

provision, which is codified at 43 PA. STAT. § 955(d), provides:

> **§ 955.  Unlawful discriminatory practices**
>
> It shall be an unlawful discriminatory practice . . .
> ***
> (d) For any person, employer, employment agency or labor organization to *discriminate in any manner against* any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a

charge, testified or assisted, *in any manner*, in any investigation, proceeding or hearing under this act.

43 Pa. Stat. § 955(d) (emphasis added).  The statutory language contained in the PHRA's antiretaliation provision is similar to that contained in Title VII's antiretaliation provision in that it proscribes *discrimination against* an individual who *in any manner* opposes an unlawful discriminatory practice, or who *in any manner* assists in an inquiry involving allegations concerning an unlawful discriminatory practice.  For this reason, in the absence of contrary guidance from the Pennsylvania courts, the United States Court of Appeals for the Third Circuit has construed the PHRA's antiretaliation provision coextensively with Title VII's antiretaliation provision.  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007).

A retaliation claim is analyzed in accordance with the *McDonnell Douglas-Burdine* burden-shifting framework.  *Krouse v. Am Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997).  The plaintiff must establish a prima facie case of retaliation.  If the plaintiff does so, the burden of proof shifts to the defendant to proffer a legitimate nondiscriminatory  reason.  If the defendant satisfies that relatively light burden, the burden shifts to the plaintiff to show that reason was just a pretext for discrimination.  Id.

**a.  Prima facie case**

In order to establish a prima facie case of retaliation under Title VII and the PHRA, Prise must demonstrate: (1) she engaged in conduct that was protected under the relevant statutory provision; (2) Alderwoods took a materially adverse[16] action or a series of materially adverse

---

[16]The United States Court of Appeals for the Third Circuit did not use the words "materially adverse" in *Kachmar v. Sungard Data Systems. Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).  The court uses those words in this case to incorporate the standard adopted by the Supreme Court in *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53, 67-70 (2006).

actions against her; and (3) there was a causal relationship between her protected conduct and Alderwoods' materially adverse response or responses to that conduct.  *Kachmar v. Sungard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

### (i) Protected conduct

With respect to the first element, Prise must show that she opposed conduct, or participated in an inquiry into conduct, that she reasonably believed to be unlawful under Title VII and the PHRA.  *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996). She need not show that the underlying conduct about which she complained had actually been violative of Title VII and the PHRA.  *Id.*  Prise, however, cannot sustain a valid retaliation claim if she opposed conduct, or participated in an inquiry involving conduct, that was obviously legal under the circumstances.  *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271-72 (2001).

Alderwoods argues that Prise did not engage in protected activity when she filed her charges of discrimination with the EEOC and the PHRC.  (Defs.' Mem. Mot. Sum. J.- Prise 15-16.)  In order to overcome this argument, Prise must demonstrate that her charges of discrimination were based on at least colorable violations of Title VII and the PHRA.  *Miller v. Yellow Freight Sys., Inc.*, 758 F. Supp. 1074, 1079-80 (W.D. Pa. 1991).  Many of the allegations lodged against Alderwoods in Prise's EEOC charge consisted of complaints about how her superiors resisted her efforts to operate Hirsch Funeral Home in conformity with Jewish law. (Pls.' J.A. at Tab 18.)  These allegations do not allege colorable violations of Title VII, since no reasonable employee would perceive an employer's exercise of its prerogative to runs its business as it sees fit as discrimination *against a particular employee* who happens to disagree with management decisions for religious reasons.  Prise's subjective intent is irrelevant to this

60

inquiry, which is governed by an objective standard.  "It is the objective message conveyed, not the subjective intent of the person sending the message, that is determinative."  *Curay-Cramer v. Ursuline Acad. of Wilmington*, 450 F.3d 130, 137 (3d Cir. 2006).  To the extent that Prise was basing her EEOC charge on complaints about Alderwoods' decisions concerning the operations at Hirsch Funeral Home, it did not constitute protected activity for purposes of the antiretaliation provision.

Prise's EEOC charge, however, included allegations involving other matters.  For instance, Prise mentioned McDermott's subsequently-rescinded instruction to her to exhaust her vacation days when taking Jewish studies classes in Chicago.  (Pls.' J.A. at Tab 18.)  She contended that Mr. Hirsch asked her to model clothes for him at his home so that he could choose attire for his friend's funeral.  (*Id.*)  She further alleged that, after she complained to Alderwoods' human resources department about the incident (on the ground that it had constituted sexual harassment), Amos warned her not to "run to HR" with her problems.  (*Id.*)  She indicated that she had not been paid as well as her male colleagues.  (*Id.*)  Couched within Prise's complaints about Alderwoods' management decisions were allegations that her own religious observances were not being accommodated.  (*Id.*)  With respect to the Baum visitation, Prise stated as follows:

> Traditionally, the Burton L. Hirsch Funeral Home has been available for immediate needs seven days a week should a death occur.  However, we have always operated consistent with Jewish law, which prohibits funerals or work on Saturdays, the Jewish Sabbath and Jewish Holy Days when scheduling visitations or funerals.  A family requested such a visitation from Michael Hilgefort, which he scheduled contrary to our practices, contrary to the fact that I am Jewish and it was my weekend to serve families, and contrary to my direct instructions.  Well in advance (Wednesday night), I asked him to reschedule the Saturday visitation at the funeral home's expense.  The other staff also requested that we reschedule, as they would not violate Jewish law or traditions.  Funeral Director Hilgefort

61

remarked to me, in front of Justin Huntsman, a student who assists at the home, that I seemed willing to work on Saturday for a Jewish family, a statement Mr. Amos echoed sometime later.  This remark was a complete misrepresentation of the situation, which was not of my making but was indeed created contrary to my direct instructions.  I appeared at the funeral home that day, under duress, only to ensure that the family whose contract had been accepted for that Sabbath day, contrary to my instructions, did not suffer inadequate service as a result.

*Id.*

While Title VII and the PHRA clearly gave Prise no license to insist that Hirsch Funeral Home operate in conformity with her religious beliefs, Prise's EEOC charge could be construed, at least in part, to assert that Alderwoods was not willing to accommodate *her* religious observances.  This view is arguably consistent with the court's prior finding that Prise satisfied the prima facie case for religious discrimination, i.e.- that (1) Prise was a member of a statutorily protected class - she was Jewish; (2) Alderwoods took an adverse employment action against her - Alderwoods discharged her, or otherwise acted in a way which adversely affected her compensation, terms, conditions, or privileges of employment; and (3) while debatable, Alderwoods' actions were taken under circumstances giving rise to an inference of religion-based discrimination - Alderwoods' actions were taken under circumstances from which a finder of fact could reasonably infer that such actions were taken "because of" Prise's "religion" within the meaning of § 2000e-2(a)).

In an email to Prise dated October 14, 2005, Mizel made the following comments:

Whether you work the days they tell you you cannot take depends on your willingness to take the consequences.  You absolutely have the legal right not to work on those days.  On the other hand, these people don't seem to realize that. They could very possibly fire you and you may not be willing to risk that.  You could work those days under protest–make sure to put everything in writing, one way or the other, e.g., write them a letter or I'll write them a letter or include it in my letter or something, and then report everything to the EEOC–and save your job, but then seek damages and make sure they don't make you do it again.

(Defs.' App.-Prise at Tab 49.)  This email indicates that Prise, when preparing to file her EEOC charge, was seeking to avoid working on Jewish holy days.  While she clearly did not have an "absolute" right under Title VII and the PHRA to refuse to work on such days, an employer's duty to provide reasonable accommodations is nevertheless invoked when an employee requests a guarantee that he or she will not have to work on a religious holiday or Sabbath.  *Protos*, 797 F.2d at 134.  When the EEOC charge is viewed in its entirety, it is clear that some of the allegations contained therein were based on colorable violations of Title VII.  The record contains sufficient evidence to establish that, at the time of the filing of her EEOC charge, Prise was under a good faith, reasonable belief that Alderwoods had engaged in, or was engaging in, an unlawful employment practice.  *Aman*, 85 F.3d at 1085.  Thus, Prise enjoyed statutory protection from retaliation when she engaged in conduct protected under the opposition and participation clauses of Title VII and the PHRA.

**(ii) Material adverse action**

The second element of a retaliation claim centers on *Burlington Northern & Sante Fe Railway Co. v. White*, 548 U.S. 53 (2006), in which the Supreme Court held that Title VII's antiretaliation provision "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." *Burlington N.*, 548 U.S. at 57.  The words "discriminate against" appearing within the text of the antiretaliation provision were construed to prohibit a broad category of retaliatory actions taken by an employer. *Id.* at 61-63.  "Title VII's anti-retaliation provision does not merely prohibit an employer from discriminating against an individual 'with respect to his [or her] compensation, terms, conditions, or privileges of employment,' but instead sweeps broadly enough to prohibit other 'materially adverse' actions

taken in retaliation for activity protected under the statute." *Johnson v. McGraw-Hill Cos.*, 451 F. Supp.2d 681, 710 (W.D. Pa. 2006). A plaintiff pursuing a retaliation claim must show that the alleged retaliatory action "would have been *materially* adverse to a reasonable employee or job applicant." *Burlington N.*, 548 U.S. at 57 (emphasis added). This standard has been formulated to "screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.* at 70.

Alderwoods argues that Prise was never subjected to a materially adverse action. (Defs.' Mem.-Prise 16-18.) The question whether a retaliatory action is "materially adverse" under *Burlington Northern* is a question of fact. *Burlington N.*, 548 U.S. at 71 ("Based on this record, a *jury* could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee.") (emphasis added). The court already concluded that, for purposes of summary judgment, a reasonable jury could find Prise can establish that she was "discharged." Since Prise was unable to earn commissions during the course of her paid suspensions, the court also concluded (for purposes of summary judgment) that a reasonable jury could find these suspensions were adverse employment actions for purposes of the substantive antidiscrimination provisions of Title VII and the PHRA. Because the suspensions could be found to be adverse employment actions, it follows *a fortiori* that a reasonable jury could find the suspensions were "materially adverse" actions within the meaning of *Burlington Northern*.

**(iii) Causation**

"With respect to the existence of a casual link between the employee's protected activity and the employer's adverse action, two main factors are relevant; (1) timing and/or (2) evidence of ongoing antagonism." *Orenge v. Veneman*, No. 04-297, 2006 WL 2711651, at **32-34 (W.D.

Pa. Sept. 20, 2004) (noting that plaintiff's retaliation claim turns on whether the plaintiff can demonstrate a causal link between her protected activity and the adverse action taken by the defendant) (citing *Abramson v. Wm. Patterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001) ("Temporal proximity . . . is sufficient to establish the causal link. [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.")).

The United States Court of Appeals for the Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920-921 (3d Cir. 1997) ("Temporal proximity is sufficient to establish the causal link."); *Jalil v. Avdel Corp.*, 873 F.2d 701 (3d Cir. 1989) (causal link established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim); *but c.f. Quiroga v. Hasbro, Inc.*, 934 F.3d 497 (3d Cir. 1991) (affirming lower court's determination that the timing of the plaintiff's discharge alone did not raise an inference of retaliation); *Krouse v. American Sterilizer Co.*, 126 F.3d at 503 (causation prong not established on timing alone where nineteen months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."). Timing, however, in connection with other types of suggestive evidence, is sufficient to demonstrate the causal link. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000). For example, the court of appeals held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima

facie case.  *Waddell v. Small Tube Products, Inc.*, 799 F.2d 69, 73 (3d Cir. 1986); *Abramson*, 260 F.3d at 289 ("Here, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); *see EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753-54 (3d Cir.1997), *cert. denied*, 522 U.S. 1147 (1998).

Prise testified that, on November 2, 2005, Johnson and McDermott told her that she was being placed on involuntary paid leave until the matters raised in her EEOC charge could be resolved.  (Pls.' J.A. at Tab 1; Prise Dep. 172.)  Prise's testimony is corroborated by Mizel's first affidavit.  (Pls.' J.A. at Tab 16 ¶ 5.)  McDermott acknowledged in his own deposition that he told Prise that she was being placed on leave while the issues raised in her EEOC charge were being addressed.  (Pls.' J.A. at Tab 8; McDermott Dep. 7, May 9, 2008.)  This action was taken by Alderwoods just six days after Prise filed her EEOC charge.  See *Doe*, 527 F.3d at 369 ("We have held temporal proximity sufficient to create an inference of causality to defeat summary judgment.").  This timing is so proximate that the court concludes Prise produced sufficient evidence of a causal relationship between her protected conduct and her suspension – and ultimate "constructive discharge" – to establish a prima facie case of retaliation.

**b.  Nonretalitory Reason**

Alderwoods argues that Prise's insubordination provided it with a legitimate, nonretaliatory reason for suspending her.  (Defs.' Memo. Mot. Sum. J. 19-20.)  Prise was suspended shortly after the staff meeting of November 2, 2005.  In his declaration, McDermott stated that Prise insisted, during the course of the meeting, that all services at Hirsch Funeral Home be prohibited during the Jewish Sabbath and on Jewish holidays.  (Defs.' App. Mot. Sum.

66

J. at Tab 10 ¶ 6.)  According to McDermott, Prise threatened to urge local rabbis to boycott

Alderwoods if it did not operate Hirsch Funeral Home in conformity with Jewish law.  (*Id.* ¶ 9.)

Leahy asserted in her affidavit that she feared a renewed public relations campaign against

Alderwoods after learning about Prise's threats.  (*Id.* at Tab 6 ¶ 22.)  According to Leahy, Prise

was placed on paid leave because of her "continued defiance" of Alderwoods' policies.  (*Id.* ¶

23.)  Based upon the evidence adduced, Alderwoods satisfied its burden of production under

*Burdine*.

### c. Pretext

Prise attempts to discredit Alderwoods' reasons for suspending her by pointing to

McDermott's acknowledgment that Prise was placed on paid suspension while the matters raised

in her EEOC charge were being worked out.  (Pls.' Br. Mot. Partial Sum. J. 5.) (Docket No. 118.)

She contends that McDermott's testimony constitutes "direct evidence" of retaliation, thereby

making a *McDonnell Douglas-Burdine* analysis unnecessary.  (*Id.*)  The court cannot agree with

this argument.  Prise's filing of the EEOC charge was only *protected* to the extent that the

allegations contained within the charge were based on an objectively reasonable, good faith

belief that Alderwoods had, in fact, violated Title VII.  *Moore v. Phila.*, 461 F.3d 331, 341 (3d

Cir. 2006) ("Whether the employee opposes, or participates in a proceeding against, the

employer's activity, the employee must hold an objectively reasonable belief, in good faith, that

the activity they oppose is unlawful under Title VII.").  The opposition and participation clauses

*do not* protect an employee from retaliation for confronting or alleging conduct which no

reasonable person would believe to be violative of Title VII's antidiscrimination provision.

*Breeden*, 532 U.S. at 269-71.  The court already explained that much of the conduct alleged in

Prise's EEOC charge concerned Alderwoods' management of *Hirsch Funeral Home*.  To the extent that Prise's EEOC charge was based upon such matters, it was *not* protected.

While the record contains evidence that Prise was suspended on November 2, 2005, *because* she had filed an EEOC charge six days earlier, it is not clear that she was suspended because of the *protected portions* of her charge.  Indeed, a reasonable trier of fact could conclude that she was placed on involuntary leave – and arguably "discharged" – solely because of the *unprotected* allegations in her EEOC charge.  According to Mizel, Herman expressed Alderwoods' desire to negotiate a separation agreement with Prise because Prise had been "striving to adhere more to Jewish law than [wa]s necessary to appeal to the Jewish community." (Pls.' J.A. at Tabs 16 ¶ 6, 36, ¶ 6.  In her declaration, Leahy indicated that Collins and she placed Prise on involuntary paid leave "pending resolution of the dispute over Saturday operations at the Hirsch Funeral Home Funeral Home."  (Defs.' App.-Prise at Tab 6 ¶ 23.)  This evidence, when coupled with McDermott's declaration that Prise's suspension came shortly after a staff meeting in which Prise argued that Hirsch Funeral Home should be operated according to Jewish law, could easily lead a reasonable jury to conclude that Prise was suspended (and "discharged") because of her resistance to Alderwoods' business decisions concerning the operations at Hirsch Funeral Home.

Alderwoods already made a tentative decision to terminate Prise on September 23, 2005. (*Id.* ¶ 16.)  The content of Prise's EEOC charge, which included several unprotected complaints about how Alderwoods was operating *its own funeral home*, may well have magnified the concerns of her superiors with respect to her unwillingness to adhere to Alderwoods' business decisions.  (Pls.' J.A. at Tab 18.)  If that is the case, Alderwoods did not violate the antiretaliation

68

provisions of Title VII and the PHRA.  *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429

U.S. 274, 286 (1977) ("A borderline or marginal candidate should not have the employment

question resolved against him because of constitutionally protected conduct.  But that same

candidate ought not to be able, by engaging in such conduct, to prevent his employer from

assessing his performance record and reaching a decision not to rehire on the basis of that record,

simply because the protected conduct makes the employer more certain of the correctness of its

decision."); *Garvey v. Dickinson Coll.* 775 F.Supp. 788, 797 (M.D. Pa. 1991) ("Nor does Title

VII protection against retaliation clothe the complainant with immunity for past and present

inadequacies, unsatisfactory performance, or uncivil conduct in dealing with her colleagues.").  It

will be for the trier of fact to determine whether Prise was "discharged," whether Alderwoods'

decisions placing Prise on involuntary paid leave were "materially adverse" actions, and whether

Prise was suspended (or "constructively discharged") *because of* activities protected under the

opposition and participation clauses of Title VII and the PHRA (rather than because of her

insubordination).  The court will deny the cross-motions for summary judgment with respect to

Prise's retaliation claims under Title VII and the PHRA.  Neither Prise nor Alderwoods is

entitled to a judgment as a matter of law with respect to the issue of retaliation.

### 3.    Equal Pay

Prise contends that Alderwoods violated the Equal Pay Act by paying her less than

similarly situated male location managers.  (Third Am. Compl. ¶¶ 82-86.)  The Equal Pay Act

was signed into law on June 10, 1963, by President John F. Kennedy.  Pub. L. No. 88-38; 77 Stat.

56 (1963).  This legislation, which is codified at 29 U.S.C. § 206(d), amended the Fair Labor

Standards Act of 1938 ("FLSA"), 29 U.S.C. § 201 *et seq.*, by adding the following language:

**(d) Prohibition of sex discrimination.**  (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C. § 206(d)(1).   In order to establish a prima facie case under the Equal Pay Act, Prise must show that Alderwoods paid employees of the opposite sex (i.e., males) more for performing equal work (i.e., "work of substantially equal skill, effort, and responsibility, under similar working conditions").  *EEOC v. Del. Dept. of Health & Soc. Servs.*, 865 F.2d 1408, 1413-14 (3d Cir. 1989).  If Prise makes such a showing, the burden shifts to Alderwoods to demonstrate the applicability of one of the four affirmative defenses enumerated within the statutory text. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195-97 (1974).

### a.  Establishment

Before proceeding any further, the court must address the meaning of the term "establishment."  The EEOC promulgated 29 C.F.R. § 1620.9, which provides:

**§ 1620.9 Meaning of "establishment."**
(a) Although not expressly defined in the FLSA, the term "establishment" had acquired a well settled meaning by the time of enactment of the Equal Pay Act.  It refers to a distinct physical place of business rather than to an entire business or "enterprise," which may include several separate places of business.  Accordingly, each physically separate place of business is ordinarily considered a separate establishment.
(b) In unusual circumstances, two or more portions of a business enterprise, even though located in a single physical place of business, may constitute more than one establishment.  For example, the facts might reveal that these portions of the

70

enterprise are physically segregated, engaged in functionally separate operations, and have separate employees and maintain separate records.  Conversely, unusual circumstances may call for two or more distinct physical portions of a business enterprise being treated as a single establishment.  For example, a central administrative unit may hire all employees, set wages, and assign the location of employment; employees may frequently interchange work locations; and daily duties may be virtually identical and performed under similar working conditions.  Barring unusual circumstances, however, the term "establishment" will be applied as described in paragraph (a) of this section.

29 C.F.R. § 1620.9.  Prise argues that the proper establishment, for purposes of her Equal Pay Act claim, is broad enough to encompass all Alderwoods' funeral homes in Pittsburgh, Pennsylvania, Harrisburg, Pennsylvania and West Virginia.  Under this argument Hirsch Funeral Home, Brandt Funeral Home and Samson Funeral Home, as well as the Neill Funeral Home and Reese Funeral Homes in Harrisburg, Pennsylvania and the Davis Funeral Home, Bartlett Funeral Home and Dorsey Funeral Home in West Virginia would be considered the proper establishment. (*Id.*) Alderwoods disputes this argument, contending that the relevant establishment is Hirsch Funeral Home alone.

The problem with Alderwoods' argument is that it is manifestly inconsistent with its argument concerning the identity of Prise's "employer."  When seeking to have Hirsch Funeral Home dismissed as a defendant, Alderwoods argued that it set all personnel, disciplinary and operations policies itself. (*Id.* at 20.)  Alderwoods argued that it determined Prise's wages, deposited her wages into her personal bank account, withheld her taxes, and provided her with employee benefits.  (*Id.*)  Admittedly, the Equal Pay Act contemplates that the same "employer" may have more than one "establishment."  29 U.S.C. § 206(d).  The factors raised by Alderwoods in support of its argument that Hirsch Funeral Home was not Prise's employer are also enumerated as factors relevant to the question whether Alderwoods' regional "market" could

71

constitute a single "establishment."  29 C.F.R. § 1620.9(b).  It is undisputed that Alderwoods'

employees frequently "interchange[d] work locations."  (*Id.*)  Under similar circumstances, courts

have treated the scope of the relevant "establishment" as a factual question to be resolved by the

trier of fact.  *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 591-92 (11th Cir. 1994); *Smith v.*

*Allstate Ins. Corp.*, 24 F. Supp.2d 870, 879 (N.D. Ill. 1998).  Consequently, the court cannot find

as a matter of law that Prise did not work in the same "establishment" as the location managers

working at Brandt Funeral Home, Samson Funeral Home, Neill Funeral Home, Reese Funeral

Home, Davis, Bartlett Funeral Home and Dorsey Funeral Home.

### b.  Prima facie case

Assuming *arguendo* that location managers working at these other funeral homes are

proper comparators for purposes of Prise's Equal Pay Act claim, Alderwoods points out that

Prise's *starting* salary was generally commensurate with that of her male comparators.  (Defs.'

Reply - Prise Resp. 2.)  Alderwoods relies on this premise to claim that Prise cannot establish a

prima facie case under the Equal Pay Act.  *Lavin-McEleney v. Marist Coll.*, 239 F.3d 476, 481-

82 (2d Cir. 2001) (explaining that where multiple comparators exist, a plaintiff cannot establish a

prima facie case under the Equal Pay Act simply by showing that she is paid less than the single

best-compensated male comparator).  This argument, however, misperceives the nature of the

prima facie inquiry.  In determining whether Prise can establish a prima facie case, the court

compares *jobs*, not *employees*.  *Beck-Wilson v. Principi*, 441 F.3d 353, 363 (6th Cir. 2006).

Prise's length of service does not relate to the nature of her *job*.  Factors such as length of

service and experience are properly considered as relevant to an employer's affirmative defense.

*Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1312 (10th Cir. 2006) (recognizing experience as

a "factor other than sex"). In *Corning Glass Works v. Brennan*, 417 U.S. 188 (1974), the

Supreme Court observed:

> The Act contemplates that a male night worker may receive a higher wage than a
> female day worker, just as it contemplates that a male employee with 20 years'
> seniority can receive a higher wage than a woman with two years' seniority.
> Factors such as these play a role under the Act's four exceptions  - -  the seniority
> differential under the specific seniority exception, the shift differential under the
> catchall exception for differentials "based on any other factor other than sex."

*Corning Glass Works*, 417 U.S. at 204.  This observation illustrates that an employee's length of

service is *not* relevant at the prima facie stage, since it is a factor upon which an employer may

base an *affirmative defense.  Id.* at 196-97.  By comparing Prise's salary with her alleged

comparators' *starting* salaries (rather than with her alleged comparators' salaries *at the time of*

*her employment as a location manager*), Alderwoods conflates Prise's need to establish a prima

facie case with its own affirmative defense.  *Dubowsky v. Stern, Lavinthal, Norgaard & Daly*,

922 F.Supp. 985, 990 (D. N.J. 1996) (observing that the affirmative defense stage, rather than the

prima facie stage, is the proper stage for comparing employees, including factors such as

education, experience and prior salary).

The evidence indicates that, as of May 1, 2005, a male location manager at Dorsey

Funeral Home was earning an annual salary of $52,000.00.  (Pls.' J.A. at Tab 38 .)  At the same

time, a male location manager at Davis Funeral Home was earning an annual salary of

$55,000.00.  (*Id.*)  The male location manager at Brandt Funeral Home, was earning $52,500.00

per year as of October 8, 2004.  (*Id.* at Tab 42.)  The parties appear to dispute the salary of a male

location manager in May 2005 at Hirsch Funeral Home.  Prise contends that the manager at

Hirsch Funeral Home was making $52,000.00 per year. (Prise Mem. Resp. Defs.' Mot. 18.)  The

record contains evidence to support this contention.  (Pls.' J.A. at Tab 38)  Alderwoods,

73

however, argues that the male location manager at Hirsch Funeral Home was only earning an annual salary of $51,000.00 in May 2005.  (Defs.' Reply- Prise's Resp. 2 n.2.)  In any event, it is clear that the salary of the male manager at Hirsch Funeral Home as of May 2005 was higher than Prise's annual salary of $50,000.00.  On the other hand, a male location manager at Bartlett Funeral Home was only earning an annual salary of $47,000.00 during that same period of time. (Pls.' J.A. at Tab 38.)

The prima facie inquiry, of course, does not end there.  Prise must still demonstrate that her alleged comparators were performing work that was "equal" to that performed by her at Hirsch Funeral Home.  *Walker v. Columbia Univ.*, 407 F.Supp. 1370, 1374 (S.D. N.Y. 1976) ("Plaintiffs have the burden of proving that as the aggrieved parties they perform *equal* work, not merely that a wage differential exists and that the jobs are similar.") (footnote omitted).  To make this showing, Prise must present evidence indicating that she was paid less than males for performing "work of substantially equal skill, effort and responsibility, under similar working conditions."  *Del. Dept. of Health & Soc. Servs.*, 865 F.2d at 1413-14.  This standard does not provide an employer with a justification for paying employees of one sex less than employees of the opposite sex because of inconsequential or trivial differences in their respective duties. *Usery v. Allegheny County Inst. Dist.*, 544 F.2d 148, 152-53 (3d Cir. 1976).  The critical question with respect to the issue of "equal work" is whether the jobs being compared have a "common core" of identical (or substantially similar) tasks.  *Brobst v. Columbus Servs. Int'l*, 761 F.2d 148, 156 (3d Cir. 1985).  If this question yields a positive answer, the inquiry turns to whether "differing or additional tasks" required by either of the jobs make the work performed by the different employees filling those jobs "substantially different."  *Id.*

74

In a declaration executed on March 26, 2009, Blute stated that there were significant differences performed by the location managers working at Alderwoods' various funeral homes. (Defs.' App. Reply- Prise Resp. at Tab 9.) (Docket No. 142.)  He declared that, "[e]ven within the same city, two funeral homes could serve vastly different customer bases and have substantially different call volumes." (*Id.* ¶ 3.)  He further explained that employees working at funeral homes serving primarily Jewish customers were rarely, if ever, expected to embalm or cremate a body.  (*Id.* ¶ 5.)  According to Blute, the abilities to embalm and cremate bodies were deemed to be "essential skills" at other funeral homes.  (*Id.*)

Prise contends that she can use the male location managers at Alderwoods' other regional funeral homes as comparators because they worked under the same "location manager job description," and in the same general market, as she did.  (Prise Mem. Resp. Defs.' Mot. 18.) This argument misses the mark.  The court's focus is on "actual job requirements and duties," not on "job classifications or titles." *Beck-Wilson*, 441 F.3d at 362.  Prise points to no evidence which contradicts Blute's affidavit.  Since the question whether an individual is a proper comparator relates to Prise's prima facie case, her failure of proof is fatal to her attempt to use the identified male location managers as comparators.

Alderwoods does not dispute Prise's assertion that she can use the male, who was the location manager at Hirsch Funeral Home before Prise assumed that position, as a comparator. Regardless whether that manager was making $51,000.00 or $52,000.00 per year as of May 2005, it is undisputed that he was making more than Prise's starting annual salary of

$50,000.00.[17]  Prise attempts to elevate that male location manager's salary by pointing out that he lived at Hirsch Funeral Home during his tenure as the location manager, and that this fringe benefit was valued at $200.00 per month – $2,400.00 per year – under the terms of the applicable lease agreement.  (Prise Mem. Resp. Defs.' Mot. 19-20.)  According to Prise, this benefit raised the male location manager's annual salary as of May 2005 to $54,400.00.  (*Id.* at 20.)  Alderwoods refutes this argument by observing that the male location manager moved into the premises at Hirsch Funeral Home before his promotion to the position of location manager, and that the lease agreement did not affect his wage rate at the time of the promotion.  (Defs.' Reply - Prise Resp. 3.)  Alderwoods argues that Prise made $3,625.15 in commissions during the ten months that she sold pre-need insurance policies, thereby increasing her wages beyond her annual salary.  (*Id.*)  When annualized, Prise's estimated commission rate, according to Alderwoods, was roughly $4,350.19 per year.  (*Id.*)

The term "wages" is broad enough to include the male location manager's fringe benefits and Prise's commissions.  29 C.F.R. §§ 1620.10; *Chisholm v. Foothill Capital Corp.*, 940 F.Supp. 1273, 1282 (N.D. Ill. 1996).  A disparity in fringe benefits between employees of opposite sexes can be used to establish a violation of the Equal Pay Act.  29 C.F.R. § 1620.11; *Arthur v. Coll. of St. Benedict*, 174 F. Supp.2d 968, 975-76 (D. Minn. 2001).  Because the issue of disparate pay relates to Prise's prima facie case, however, she has the burden of production with respect to this issue.  In her brief, Prise asserts that she was never *offered* the chance to live at Hirsch Funeral Home.  (Prise Mem. Resp.  Defs.' Mot. 19.)  Alderwoods intimates that Prise

---

[17]The Equal Pay Act prohibits even a small difference in pay between members of opposite sexes performing equal work.  *Hodgson v. Am. Bank of Commerce*, 447 F.2d 416, 420 (5th Cir. 1971) ("Any wage differential between the sexes, no matter how small and insignificant, is sufficient under the statutory prohibition.").

would have been able to live at Hirsch Funeral Home had she chosen to do so.  (Defs.' Reply Prise Resp. 3 n.4.)  The male location manager testified that he moved out of Hirsch Funeral Home during the spring of 2005.  (Pls.' J.A. at Tab 6; Hilgefort Dep. 45.)  Alderwoods produced a declaration from Johnson stating that after the male location manager moved out of Hirsch Funeral Home, the residential area remained unoccupied until it was destroyed by a fire in January 2009.  (Defs.' App. Reply - Prise at Tab 2, Second Supplemental Decl.- Johnson ¶ 5.) (Docket 144.)  Prise points to no evidence indicating that Alderwoods would have been unwilling to permit her to reside at Hirsch Funeral Home had she chosen to do so.  Consequently, the court does not consider the annual $2,400.00 fringe benefit, which may have been available to Prise as well, in determining whether there was a pay disparity between Prise and the male location manager at Hirsch Funeral Home.  *Glover v. KinderCare Learning Ctrs, Inc.*, 980 F.Supp. 437, 444 (M.D. Ala. 1997); *Passmore v. KinderCare Learning Ctrs, Inc.*, 979 F.Supp. 1413, 1420 (M.D. Ala. 1997).

When Prise's estimated commissions are factored into the equation, she was arguably making more money than the male location manager at Hirsch Funeral Home.  Of course, she earned the commissions for selling pre-need insurance policies.  Prise cannot establish the existence of a potentially actionable pay disparity if her commissions had the effect of elevating her earnings above those of the male location manager.  *Marting v. Crawford & Co.*, 203 F.Supp.2d 958, 965-96 (N.D. Ill. 2002).  The Equal Pay Act does not give the court a mandate to evaluate jobs for the purpose of determining a proper or fair pay differential between two employees performing unequal work.  *Horner v. Mary Inst.*, 613 F.2d 706, 715 (8th Cir. 1980); *Usery v. Columbia Univ.*, 568 F.2d 953, 962, n. 3 (2d Cir. 1977); *Hofmister v. Miss. State Dept.*

*of Health*, 53 F.Supp.2d 884, 892 (S.D. Miss. 1999). Whether Prise can establish a prima facie case under the Equal Pay Act is doubtful.

### c. Affirmative defense

Even if it is assumed that Prise satisfied her burden at the prima facie stage, Alderwoods presented sufficient evidence to establish an affirmative defense under the Equal Pay Act. When the burden of persuasion shifts to the employer in an Equal Pay Act case, the employer must prove the applicability of at least one of the statutorily enumerated affirmative defenses "so clearly that no rational jury could find to the contrary." *Del. Dept. of Health & Soc. Servs*, 865 F.2d at 1414. In *Stanziale v. Jargowsky*, 200 F.3d 101 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit construed the words "except where such payment *is made pursuant to*," as they appear within the text of the Equal Pay Act, to require an employer to present affirmative evidence to support its reasons for paying the plaintiff less than a comparator of the opposite sex. *Stanziale*, 200 F.3d at 107-08 ("We read the highlighted language of the statute as requiring that the employer submit evidence from which a reasonable factfinder could conclude not merely that the employer's proffered reasons *could* explain the wage disparity, but that the proffered reasons *do in fact* explain the wage disparity.") (emphasis in original). When an employer seeks summary judgment on the basis an affirmative defense under the Equal Pay Act, it must "produce sufficient evidence such that no rational jury could conclude but that the proffered reasons [for paying the plaintiff less than a comparator of the opposite sex] *actually motivated* the wage disparity of which the plaintiff complains." *Id.* at 108 (emphasis added).

If a plaintiff is able to make a prima facie case, the burden shifts to the defendant. The defendant can raise one of the four affirmative defenses stated in the Equal Pay Act. The four

affirmative defenses include three that are "specific and one general catchall." *Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974).  A difference in payment between opposite sexes is permissible if it is made pursuant to: (1) a seniority system, (2) a merit system, (3) a system which measures earnings by quantity or quality of production, or (4) a system based upon any other factor other than sex (the "catchall defense"). *Id.* at 196-97. An employer cannot prevail at the summary judgment stage based upon an affirmative defense unless it can prove the existence of the affirmative defense "so clearly that no rational jury could have found to the contrary." *Del. Dep't of Health*, 865 F.2d at 1414.  Under the Equal Pay Act, a plaintiff does not need to prove that an employer intended to discriminate. A showing of intent, however, may be used to establish that an employer's affirmative defense is a pretext for discrimination. *Del. Dep't of Health*, 865 F.2d at 1414.

> In her declaration, Leahy made the following statement:

> When Prise was promoted to location manager, I approved her salary based on her experience, the market location, and the funeral home's budget.  Her salary was in line with the prior manager at Hirsch.

(Defs.' App.-Prise at Tab 6 ¶ 13.)  Unlike the male location manager, who had started as the location manager at Hirsch Funeral Home at an annual salary of $48,000.00 before receiving a $2,000.00 per year increase after the completion of a ninety-day probationary period, Prise immediately started to work in that same position at an annual salary of $50,000.00.  Prise left that position before May 2006, a month during which the pay records of Alderwoods' other location managers show that salaries were typically raised.  (Pls.' J.A.  at Tab 38.)  While length of service (i.e., degree of experience) is not relevant at the prima facie stage, it is clearly relevant when an employer relies upon it as a "factor other than sex" to establish the applicability of an

79

affirmative defense available under the Equal Pay Act.  *Corning Glass Works*, 417 U.S. at 204

(noting that the Equal Pay Act "contemplates that a male employee with 20 years' seniority can

receive a higher wage than a woman with two years' seniority").  The Equal Pay Act provides

that an employer may lawfully pay an employee of one sex less than an employee of the opposite

sex when such a differentiation is based on a "seniority system."  29 U.S.C. § 206(d)(1).

Prise acknowledged in her deposition that she did not know how the salaries of

Alderwoods' employees were determined.  (Pls.' J.A. at Tab 1; Prise Dep. 379.)  This

acknowledgment by Prise leaves Leahy's declaration uncontradicted.  *Hutchins v. Intern'l Bhd.

of Teamsters*, 177 F.3d 1076, 1081-82 (8th Cir. 1999).  Prise did not start her job as Hirsch

Funeral Home's location manager at a lower salary than that which had been given to the male

location manager at the inception of his tenure in the same position.  Alderwoods produced

affirmative evidence explaining the factors that were considered in determining Prise's starting

salary.  Under these circumstances, Alderwoods sustained its burden of establishing, at the

summary judgment stage, that it is entitled to a judgment as a matter of law with respect to

Prise's Equal Pay Act claim.  *Oguezuonu v. Genesis Health Ventures, Inc.*, 415 F. Supp.2d 577,

589 (D. Md. 2005).  No reasonable jury could conclude other than that Prise's salary was based

upon the permissible factors proffered by Alderwoods.  *Stanziale*, 200 F.3d at 108.  Accordingly,

summary judgment will be entered in favor of Alderwoods with respect to Prise's Equal Pay Act

claim.

**B.    Rady's claims**

In the third amended complaint, Rady alleges both sex-based discrimination and

retaliation under Title VII and the PHRA, as well as claims for unequal pay under the Equal Pay

Act.  (Third Am. Compl. ¶¶ 87-104.)  During a hearing conducted on November 17, 2008, the

court held that Rady's sex-based discrimination claims under Title VII and the PHRA would be

stricken, since she was not granted leave to add those claims.  (Hr'g Tr. Mots., Nov. 17, 2008.)

(See Docket, Nov. 17, 2008.)   For this reason, the only remaining claims to be addressed are

Rady's retaliation and Equal Pay Act claims.[18] ( Third Am. Compl. ¶¶ 91-92, 98-104.)  Like

Prise, Rady now acknowledges that Alderwoods was her employer.  (Rady Mem. Resp. Defs.'

Mot. 1 n.1.)   Therefore, she no longer asserts claims against Hirsch Funeral Home, Brandt

Funeral Home and Samson Funeral Home.  (*Id.*)

###### 1.      Retaliation

As noted earlier, the antiretaliation provisions of Title VII and the PHRA are generally

coextensively construed.  *Marra*, 497 F.3d at 300.  Neither party argues that the application of

the PHRA's antiretaliation provision differs from that of Title VII within the context of this case.

Consequently, the court's discussion will apply equally to Rady's retaliation claims under both

statutory provisions.

###### A.  Prima facie case

###### (i)  Protected conduct

Rady filed a charge of discrimination with the EEOC in November 2004, alleging sex-

based discrimination in the form of daily harassment and unequal pay.  (J.S.-Rady ¶ 23; Defs.'

App.-Rady at Tab 40.)  She alleged that she was wrongfully denied a promotion in May 2004.

(*Id*.) This charge of discrimination was dual-filed with the PHRC.  On March 29, 2005, Rady and

Alderwoods executed a settlement agreement.  (*Id.* at Tab 41.)  As a part of this agreement, Rady

---

[18]To the extent that the applicable legal standards were articulated in the portion of this opinion concerning Prise's claims, they will not be repeated.

agreed not to institute an action based upon the allegations contained in her EEOC and PHRC charges.  (*Id.*)  Alderwoods agreed to pay Rady an amount equal to the commissions that she would have made had she been allowed to sell pre-need insurance policies.  (Rady Countersts - Defs.' Resp. ¶ 25.) (Doc. No. 158)  Because of the settlement agreement, the parties agree that only actions occurring after March 29, 2005, may give rise to liability under Title VII, the PHRA or the Equal Pay Act.

The period of time relevant to Rady's claims began on March 29, 2005, and ended on July 31, 2006.  (Rady Mem. Resp. Defs.' Mot. Sum. J. 7-8.)  Rady alleges that she was subjected to a series of retaliatory actions after the settlement.  She avers that: (1) in May 2005, McDermott instructed other employees to document any faults in her performance; (2) in July 2005, Alderwoods' management attempted to blame her for a theft at Brandt Funeral Home; (3) in July 2005, she was disciplined after a male student unsuccessfully tried to reach her; (4) after the settlement, she was routinely excluded from golf outings and football games to which other employees were invited; and (5) in January 2006, she was not afforded an opportunity to apply for a market sales manager position available at Alderwoods.  (Third Am. Compl. ¶ 31(a)-(e)).  Rady filed a second EEOC charge on April 6, 2006, alleging further violations of Title VII, the Equal Pay Act and the PHRA.  (Defs.' App.-Rady at Tab 56.)  The charge was dual-filed with the PHRC.

Rady avers that she was also retaliated against for filing the April 6, 2006 charge.  She alleges that, on April 28, 2006, Amos and Johnson decided to work on obtaining a "paper trail" to justify dismissing her.  (Third Am. Compl. ¶ 32(b)).  She contends that, because her superiors and co-workers went to great lengths to scrutinize and document all her shortcomings, her

working conditions became so intolerable that she was forced to resign. (*Id.* ¶¶ 33-35.) In support of her retaliation claims, Rady alleges that, on April 7, 2006, Amos and Johnson warned her at a meeting that she would be terminated if her performance did not improve. (*Id.* ¶ 31(f)). Although this meeting occurred just one day after the filing of Rady's second EEOC charge, there is no evidence in the record, and Rady does not appear to allege, that any Alderwoods' personnel knew on April 7, 2006, that she filed a second EEOC charge. As far as the court can tell, Rady believes that the warning conveyed to her on April 7, 2006, was in retaliation for her initial EEOC charge in November 2004. (*Id.*)

**(ii) Material adverse action**

Alderwoods argues that Rady's filing of her second EEOC charge on April 6, 2006, did not constitute statutorily protected conduct because she lacked an objectively reasonable belief that the conduct alleged in her charge constituted a violation or multiple violations of Title VII. (Defs.' Reply - Rady Resp. 6-7.) The court need not reach this question for two reasons. First, it is undisputed that Rady's filing of her initial EEOC charge in November 2004 constituted protected activity. Second, it is likewise undisputed that Alderwoods' decision to document Rady's work-related deficiencies (i.e., the only materially adverse action for which Rady provides evidentiary support) was made *before* the filing of her second EEOC charge. Thus, for purposes of summary judgment, the court assumes *arguendo* that Rady engaged in protected conduct when she filed her second EEOC charge.

Rady contends that she was constructively discharged from her position at Alderwoods on July 31, 2006, when she presented Johnson with a letter of resignation. (Rady Mem. Resp. Defs.' Mot. 10-11.) In order to establish that she was constructively discharged, Rady must

demonstrate that her working environment at Alderwoods had become "so intolerable that her resignation qualified as a fitting response." *Suders*, 542 U.S. at 134. This standard is objective. As the Supreme Court has said, a plaintiff who advances a constructive discharge claim under Title VII "must show working conditions so intolerable that a *reasonable person* would have felt compelled to resign." (*Id.* at 147) (emphasis added). Therefore, Rady cannot establish liability for constructive discharge merely by showing that she subjectively felt compelled to resign.

Under the present circumstances, no reasonable jury could find that Rady was constructively discharged. She argues in her brief that her job search "intensified" after her April 7, 2006, meeting with Amos and Johnson. (Rady Mem. Resp. Defs.' Mot. 11-12.) This argument does not square with her deposition testimony. In her deposition, Rady testified that she first interviewed for the position at Farnsworth Funeral Home in April 2006. (Defs.' App.-Rady at Tab 3; Rady Dep. 174-75, Mar. 31, 2008.) She stated that she was *not* actively looking for a job at that time. (Defs.' App.-Rady at Tab 3; Rady Dep. 191.) According to Rady's testimony, Prise learned about the vacancy at Farnsworth Funeral Home while teaching at PIMS. (Defs.' App.-Rady at Tab 3; Rady Dep. 191.) Prise apparently called the opening to Rady's attention. (Defs.' App.-Rady at Tab 3; Rady Dep. 191.) The testimonial record belies Rady's contention that she accelerated her quest for new employment because of her meeting with Amos and Johnson.

The record contains ample evidence that Alderwoods' personnel were documenting Rady's work-related deficiencies with an eye toward terminating her. That activity is not subject to serious dispute. In order for such documentation to support a *constructive discharge* claim, Rady must establish that she was aware of it *at the time of her resignation*. *McWilliams v. W. Pa.*

84

*Hosp.*, 717 F. Supp. 351, 356 (W.D. Pa. 1989) ("For example, plaintiff claims that one of the

conditions making her employment intolerable was the fact that Kurtz failed to inform plaintiff

of her potential selection for a displaywriter program.  If plaintiff did not know about this

omission before her resignation, this omission could hardly contribute to an allegedly intolerable

atmosphere.").  When Rady sought leave to add her constructive discharge claims, however, she

filed an affidavit stating that she had learned about Alderwoods' documentation of her

shortcomings *through discovery*.  (Pls.' J.A. at Tab 27 ¶ 9.)  She could not

have felt compelled to resign from her position at Alderwoods *because* of matters that were not

known to her until a later date.[19]

        Given the foregoing analysis, Rady cannot establish that she was constructively

discharged.  The inquiry, however, does not end there.  Retaliation need not rise to the level of a

constructive discharge in order to be actionable.  In her first two complaints, Rady asserted

retaliation claims under Title VII that did not amount to constructive discharge claims.  (Compl.

¶¶ 72-73; First Am. Compl. ¶¶ 86-87 (Docket No. 23.))  After her PHRA claims were exhausted,

she amended her complaint to add retaliation claims under the PHRA which mirrored her

retaliation claims under Title VII.  (Second Am. Compl. ¶¶ 88-89, 94-95.) (Docket No. 39.)   The

retaliation claims contained in Rady's third amended complaint included hostile work

environment and constructive discharge claims, and the court understands them to also

incorporate the general retaliation claims that had been asserted in her earlier complaints.  (Third

---

        [19]Admittedly, Rady believed that her actions were being documented.  In her EEOC charge of April 6,
2006, she alleged that Alderwoods' "scrutiny" of her worsened after her filing of the November 2004 EEOC charge.
(Pls.' J.A. Resp. Defs.' Mot. Sum. J. at Tab 31.)  She, however, had no precise knowledge about Alderwoods' efforts
to document her shortcomings prior to her resignation.  In her affidavit, she stated that, during the last few months of
her employment at Alderwoods, she did not have a basis beyond her "subjective belief" for knowing whether her
suspicions of a plan to effectuate her termination were "based upon grounded or ungrounded fears."  ( *Id.* at Tab 27 ¶
5.)

Am. Compl. ¶¶ 91-92, 98-99.)  Thus, Rady is not precluded from pursuing retaliation claims merely because she cannot show that she was constructively discharged.

In *Jensen v. Potter*, 435 F.3d 444, 448-53 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co v. White*, 548 U.S. 53 (2006), the United States Court of Appeals for the Third Circuit held that retaliatory harassment which was sufficiently severe or pervasive to alter the "terms, conditions, or privileges" of one's employment constituted a violation of § 2000e-3(a).  In so holding, the court of appeals proceeded on the assumption that § 2000e-3(a) prohibited "a quantum of discrimination coterminous with that prohibited by" § 2000e-2(a).  *Jensen*, 435 F.3d at 448.

The Supreme Court issued its decision in *Burlington Northern* less than five months later and recognized that Title VII's antidiscrimination and antiretaliation provisions were *not* coterminous, since the language of the antiretaliation provision did not refer specifically to one's "terms, conditions, or privileges of employment."  *Burlington N.*, 548 U.S. at 61-63.

Harassment is actionable under Title VII for a discrimination claim only where it is sufficiently "severe or pervasive" to alter the "terms, conditions, or privileges" of one's employment.  *Meritor Savings* Bank, 477 U.S. at 67.  Under *Burlington Northern*, however, "the anti-retaliation provision does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace."  *Burlington N.*, 548 U.S. at 57.  Consequently, there is no need for a plaintiff proceeding on a theory of retaliatory harassment to show that such harassment was sufficiently "severe or pervasive" to alter the "terms, conditions, or privileges" of his or her employment.  Instead, he or she need only show that the retaliatory harassment, taken as a whole, would have been materially adverse to an objectively reasonable employee.

86

*Moore v. Phila.*, 461 F.3d 331, 341-42 (3d Cir. 2006).  Put another way, retaliatory harassment is actionable where it is sufficiently "severe or pervasive" to dissuade an objectively reasonable employee from engaging in activity protected under § 2000e-3(a).  *Burlington N.*, 548 U.S. at 68.

"[R]etaliatory actions that are not materially adverse when considered individually may collectively amount to a retaliatory hostile work environment." *Billings v. Grafton*, 515 F.3d 39, 54 n13 (1ˢᵗ Cir. 2008).  As noted earlier, however, Rady was not aware that her superiors and co-workers were scrutinizing and documenting her deficiencies while she was employed by Alderwoods.  (Pls.' J.A. at Tab 27 ¶¶ 4-5, 9.)  Although she may have sensed a hostile undercurrent of surveillance-related actions, she learned about the surrounding details only through discovery.  (*Id.*)

Rady claims that Alderwoods' personnel tried to blame her for a theft of money that occurred at Brandt Funeral Home in July 2005.  In her deposition, however, she acknowledged that *she* was the last person known to have handled the money prior to the theft.  (Pls.' J.A. at Tab 9; Rady Dep. 74.)  She testified that *all* employees in the immediate vicinity of the theft were asked to prepare written statements about what they witnessed or observed.  (*Id.*)  Johnson evidently told Rady that he did *not* consider her to be a suspect.  (Pls.' J.A. at Tab 27 ¶ 9; Rady Dep. 74-75.)  According to Rady, Johnson insinuated that she was guilty of the theft by referring to it as an "inside job."  (Pls.' J.A. at Tab 27 ¶ 9; Rady Dep. 76.)  Such a generalized comment is insufficient to satisfy the standard of material adversity established by the Supreme Court in *Burlington Northern*.  *Burlington N.*, 548 U.S. at 68 ("An employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor

87

annoyances that often take place at work and that all employees experience."). It follows *a fortiori* that such a comment cannot provide a basis for a constructive discharge claim.

Rady's claims that she was excluded from golf outings and football games to which some of her co-workers were invited. Slights such as this, unless there is evidence that those activities were related to the ability to generate business or to be promoted, are relatively slight and are beyond the purview of Title VII's antiretaliation provision. *Weger v. Ladue*, 500 F.3d 710, 727-28 (8th Cir. 2007) (finding that alleged ostracizing of female communications officer by police chief and other officers, in form of excluding them from male police officers' "happy hours," if proven, was not materially adverse action upon which Title Vii retaliation claims could be based).

On July 21, 2005, Rady received a written "notice of disciplinary action" for leaving for vacation when she was supposed to be on call. (Defs.' App.-Rady at Tab 46.) The notice indicated that Rady failed to respond to a voicemail message that McDermott left on her cellular phone. (*Id.*) The only "corrective action" that was taken against her was an admonition that she needed to notify her location manager, i.e., Johnson, when she needed to change her schedule, and that she needed to respond to messages from her superiors and co-workers. (*Id.*) Courts have consistently held that the mere documentation of this type of constructive criticism does not constitute a materially adverse action. *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009); *Kline v. Springer*, 602 F.Supp.2d 234, 242 (D. D.C. 2009); *Bentley v. Allbritton Comm'cs Co.*, No. 07-889, 2008 U.S. Dist. LEXIS 93237, at *40 (M.D. Pa. Nov. 17, 2008). No reasonable employee would feel compelled to resign because of such a reprimand.

Rady contends that she was denied an opportunity to apply for a market sales manager position that was available at Alderwoods in January 2006.  (Rady's Mem. Resp. Defs.' Mot.11.) She argues that the job was never posted.  (*Id.*)  Amos' wife was ultimately chosen for the position.  Amos testified that the vacancy was posted at both Brandt Funeral Home and Hirsch Funeral Home.  (Defs.' App. Reply- Rady at Tab 2; Amos Dep. at 68.)  Rady cites to no evidence which supports her assertion that the vacancy was never posted.  Hence, no reasonable jury could disbelieve Amos' uncontradicted testimony.  Even if Rady were able to establish that Alderwoods did not post the vacancy, it is difficult to fathom how a reasonable trier of fact could infer a specific intent to retaliate *against Rady* from a generalized decision by Alderwoods not to provide *its employees,* including those other than Rady, with notice of a particular vacancy.  This instance of alleged retaliation is unsupported by the evidentiary record.

With respect to the issue of material adversity, the only remaining question is whether the decision by Alderwoods to document Rady's deficiencies constituted a materially adverse action. This court previously opined that negative performance evaluations and written reprimands may constitute materially adverse actions in certain instances.  *Genevie v. Jackson*, No. 05-1733, 2008 U.S. Dist. LEXIS 23065, at **41-42 (W.D. Pa.  Mar. 24, 2008).  In this case, the record clearly indicates that Johnson wanted to document Rady's deficiencies for the express purpose of effectuating her termination.  (Defs.' App.-Rady at Tabs 44, 47, 52, 64.)  The materially adverse standard is general enough to prohibit *any* retaliatory act that might dissuade an objectively reasonable employee from making or supporting a charge of discrimination.  *Burlington N.*, 548 U.S. at 69.  While Rady's unawareness of the surveillance and documentation during the relevant period of time is fatal to her constructive discharge claims, it is not relevant to the underlying

89

question of material adversity.  A reasonable jury may find that retaliation occurred when an employer covertly denied him or her a pay raise given to all other employees, or engaged in similar forms of covert retaliation, even though the employee retaliated against is unaware of the retaliatory conduct.  The question whether an action is materially adverse is a question of fact, not a question of law.  (*Id.* at 70-71.)  Accordingly, a reasonable jury could conclude that the decision by Alderwoods to create a "paper trail" justifying Rady's dismissal constituted a materially adverse action under *Burlington N.*.  (Pls.' J.A. at Tab 25.)

**(iii) Causation**

"The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific."  *Kachmar*, 109 F.3d at 178.  In order for temporal proximity between protected activity and a materially adverse action to alone give rise to an inference of a retaliatory animus, the timing of the materially adverse action must be "unusually suggestive" of an intent to retaliate.  *LeBoon v. Lancaster Jewish Cmty. Ctr Assoc.*, 503 F.3d 217, 232-33 (3d Cir. 2007).  Absent such temporal proximity, the plaintiff must produce some other evidence of causation.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000).

The record contains no evidence that Alderwoods' decision to document Rady's deficiencies was triggered by the filing of her second EEOC charge.  Indeed, that decision was made *before* the EEOC charge was filed.  In an email to Amos dated January 20, 2006, Johnson insinuated that Rady needed to be terminated.  (Defs.' App.-Rady at Tab 47 ("Something has to be done at some point and I think we both need to do it.").  Two months later, on March 27, 2006, Johnson expressly informed Amos and Blute that he wanted Rady to be discharged.  (*Id.* at

Tab 52.)  Shortly thereafter, Leahy urged Blute to ask Gibson whether Alderwoods had a

legitimate basis for discharging Rady.  (*Id.* at Tab 54.)  Collins suggested that Gibson speak with

Rady to discuss her performance.  (*Id.*)  In a declaration dated January 19, 2009, Gibson made

the following statements:

> 3.  In March 2006, I received a request from Peter Johnson, the location manager at Brandt Funeral Home, for authority to terminate Heather Rady's employment with Alderwoods for cause.
>
> 4.  I advised Johnson and other Alderwoods executives that I did not recommend terminating Rady without greater documentation of her performance deficiencies.  I instead instructed Johnson to meet with Rady and attempt to correct her performance with individualized instruction.  I also recommended to Johnson that, in the event Rady's poor performance continued, he should thoroughly document her misconduct and performance deficiencies.
>
> 5.  At no time did I ever direct, insinuate, or otherwise suggest that Johnson or any other Alderwoods employee create documentation of Rady's misconduct in order to justify termination or any other level of employee discipline.
>
> 6.  I always request that management document employee misconduct and poor performance before disciplinary action is taken.  Complete documentation ensures that discipline is properly tailored to misconduct and is consistently applied.

(*Id.* at Tab 55 ¶¶ 3-6.)  As noted earlier, Rady implicitly concedes that, at the time of the April 7,

2006, meeting, Amos and Johnson did not know that she had filed a charge of discrimination

with the EEOC on the previous day.  Hence, the record clearly indicates (and Rady does not

appear to dispute) that Johnson wanted to terminate Rady *before* the filing of her second EEOC

charge.

On April 28, 2006, Amos suggested in an email to Johnson that Rady be asked to transfer

exclusively to the sale of pre-need insurance policies.  (Pls.' J.A. at  Tab 25.)  He also indicated

that Alderwoods should "continue to work on a paper trail for dismissal." (*Id.*)  In an email to

Amos dated June 20, 2006, Johnson stated that he had instructed Hilgefort and Huntsman to

document all of their "grievances and problems" concerning Rady.  (Defs.' App.-Rady at Tab

64.)  The record contains evidence that Hilgefort and Huntsman provided Johnson with

documentation of Rady's allegedly deficient performance.  (*Id.* at Tabs 63, 65.)  In a letter to

Johnson dated July 19, 2006, Maizlech complained about Rady's handling of the Robinowitz

funeral.  (*Id*. at Tab 67.)  The Robinowitz family received a $250.00 discount from Alderwoods.

Alderwoods' record of the discount indicated that the Robinowitz family requested that Rady be

fired.  (*Id*. at Tab 66.)

  The undisputed evidence of record indicates that Johnson was seeking to have Rady

terminated before she filed her second EEOC charge, and that he continued to make his case for

her termination thereafter.  Neither Title VII nor the PHRA required Alderwoods to give Rady

preferential treatment because she filed a charge of discrimination.  *Breeden*, 532 U.S. at 272

("Employers need not suspend previously planned transfers upon discovering that a Title VII suit

has been filed, and their proceeding along lines previously contemplated, though not yet

definitively determined, is *no evidence whatever of causality*.")(emphasis added).  It is axiomatic

that subsequent conduct cannot be the motivation for a preexisting decision.  Consequently, Rady

cannot establish that Alderwoods retaliated against her *because of* her second EEOC charge.

  Rady's first EEOC charge was resolved by a settlement agreement signed by Rady and

Herman on March 29, 2005.  (Defs.' App.-Rady at Tab 41.)  Approximately two months later,

Johnson sent an email to Amos stating that Rady was complaining when asked to do work.  (*Id.*

at Tab 43.)  McDermott received a copy of this message.  (*Id.*)  Johnson never said anything

about terminating Rady or documenting her allegedly poor performance in that message.  (*Id.*)

Instead, he simply warned that she would be "blasting out" some complaints via email.  (*Id.*)  The

message indicated that Rady asked Johnson for Amos' email address.  (*Id.*)

> In an email to Amos dated July 7, 2005, Johnson stated as follows:
>
> Randy, is it required that we go through the PIP process with Heather or can we
> continue to document then dismiss if behavior continues.  I realize she is litigous
> [sic], having brought suit against us already, however her poison attitude is
> affecting every employee.  I suspect that she read my e-mail, as it was up on the
> back computer, but I cannot say for sure.  I was using e-mail and left the room and
> when I came back in she was on the computer that I had just been using.  Also
> since then she has not spoken to me.  Not a single word since Tuesday afternoon.
> This is quite childish.  I know we need to dot all of our I's and cross our T's so we
> do everything correctly, however this whole thing is getting old.

(*Id.* at Tab 44.)  This message was sent one day after McDermott informed Amos that Rady was

not promptly returning her telephone messages.  (*Id.* at Tab 45.)  Shortly thereafter, Rady

received a "notice of disciplinary action" in which she was told to notify her superiors and

co-workers of changes to her schedule, and to respond promptly to all work-related messages.

(*Id.* at Tab 46.)

More than three months elapsed between the signing of Rady's settlement agreement with

Alderwoods and Johnson's July 7, 2005, email to Amos.  The temporal proximity – more than

three months – between these two events is insufficient to give rise to an inference of a

retaliatory animus.  *Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760-61 (3d Cir.

2004).  Therefore, in order to establish causation, Rady must present other evidence of a

retaliatory motive.  *Thomas v. Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003).  Rady believes that

she can establish causation by pointing to specific references to her protected conduct in the

documentary evidence.  For instance, Johnson specifically observed that Rady was litigious in his

July 7, 2005, email to Amos.  (Defs.' App.-Rady at Tab 44.)  On March 27, 2006, when Johnson
sought permission to terminate Rady, he noted that she had "zinged" Alderwoods with a prior
EEOC filing.  (*Id.* at Tab 52.)  When Leahy learned about Johnson's request, she sent Blute a
message warning that Rady might "join Deborah in her quest," indicating that the case for
discharging Rady had to be "tight."  (*Id.* at Tab 54.)   It was in response to that message that
Collins suggested that Chuck Gibson speak with Rady about Alderwoods' expectations.  (*Id.*)

     The references to Rady's first EEOC charge in these three email messages do not
strengthen Rady's case.  Interestingly, these messages were submitted to the court by Alderwoods
rather than by Rady.  If anything, the references to Rady's protected conduct indicate that some
members of Alderwoods' upper management were *hesitant* to discharge Rady because of her
prior charge of discrimination.  Johnson was apparently attempting to convince Alderwoods
personnel to terminate Rady *in spite of* the fact that she might choose to take further legal action.
*Naeem v. McKesson Drug Co., Inc.*, No. 95 C 5425, 2002 U.S. Dist. LEXIS 11791, at *3 n.1
(N.D. Ill. Aug. 13, 2001) (observing that "any reasonable employer" would attempt to create a
"paper trail" of misconduct before dismissing an employee known to have "a penchant to run to
the EEOC").  While employees enjoy statutory protection from retaliation for engaging in
conduct protected under the opposition and participation clauses, they are not entitled to special
treatment or accommodations simply because of their protected conduct.  *Pulley v. KPMG
Consult., Inc.*, 348 F.Supp.2d 388, 397 (D. Md. 2004).  Under the present circumstances, the
email messages upon which Rady relies indicate that she may have been terminated *but for* her
protected conduct.

It is important to remember that Rady was *not* discharged, nor did she experience a decrease in her pay or benefits.  (Defs.' App.-Rady at Tab 3; Rady Dep. 56.)  The materially adverse action at issue is Alderwoods' decision to document Rady's shortcomings for the purpose of terminating her.  That decision was made in March 2006.  (Defs.' App.-Rady at Tab 55 ¶¶ 3-4.)  This decision was made a *full year* after the execution of the settlement agreement and a little more than a week *before* the filing of Rady's second EEOC charge.[20]  Based upon the present state of the record, no reasonable jury could infer or conclude that Alderwoods decided to document Rady's alleged misconduct *because of* her statutorily protected conduct.  Because Rady cannot establish the third element of a prima facie case of retaliation, i.e., causation, Alderwoods is entitled to summary judgment with respect to Rady's retaliation claims under Title VII and the PHRA.

2.      **Equal Pay**

Rady alleges that Alderwoods violated the Equal Pay Act by paying her less than her male comparators for performing equal work.  (Third Am. Compl. ¶¶ 100-04.)  The parties agree that the relevant period of time, for purposes of this claim, began on March 29, 2005, and ended on July 31, 2006.  (Rady Mem. Resp. Defs.' Mot. 7-8.)

On March 29, 2005, Rady and Alderwoods executed a settlement agreement to resolve the matters raised in Rady's first EEOC charge.  (Defs.' App.-Rady at Tab 41.)  The first paragraph of the settlement agreement provided as follows:

---

[20]Alderwoods made the decision to promote Prise, rather than Rady, to the position of location manager at Hirsch Funeral Home shortly after the execution of the settlement agreement.  In an email to Amos dated May 9, 2005, McDermott stated that Rady was "quick" to go to the EEOC, and that the decision to promote Prise needed to be explained to Rady.  (Pls.' J.A. at Tab 30.)  Rady does not base her retaliation claims on this particular personnel decision.

> In exchange for the promises made by the Respondent in paragraph 7, obtained through the Equal Employment Opportunity Commission's (EEOC) Mediation Program, pursuant to this charge, the Charging Party agrees not to institute a law suit under Title VII of the Civil Rights Act of 1964 (Title VII), Title I of the Americans With Disabilities Act (ADA), the Age Discrimination in Employment Act (ADEA), the Equal Pay Act (EPA) or any other law enforced by the EEOC, based on this charge, or any charge that may have been dual-filed with the Pennsylvania Human Relations Commission (PHRC).

*Id.*  Unfortunately, the substantive portions of the settlement agreement were redacted, making it impossible for the court to appreciate the full nature of the parties' understanding.

Alderwoods argues that Rady waived her Equal Pay Act claims when she signed the settlement agreement on March 29, 2005.  (Defs.' Reply -Rady Resp. 2.) (Docket 143.)  An employee is free to waive a claim under the Equal Pay Act as a part of a settlement agreement mediated by the EEOC.  *Wagner v. NutraSweet Co.*, 95 F.3d 527, 532 (7th Cir. 1996).  The extent of such a waiver, of course, depends on the terms of the settlement agreement.  *Spiridigliozzi v. Bethlehem Mines Corp.*, 558 F. Supp. 734, 736 (W.D. Pa. 1980).  Because the terms of the settlement agreement entered into between Rady and Alderwoods were presented to the court in a mostly redacted form, the court cannot engage in an exhaustive examination of the terms of Rady's waiver.  The plain language of the unredacted portion of that agreement, however, indicates that Rady waived any *claims* that she may have had based upon the charges of discrimination that she filed in November 2004 with the EEOC and the PHRC.  (Defs.' App. Mot. Sum. J. at Tab 41.)  Nothing in the language of the unredacted portions of the agreement indicates that Rady waived *substantive rights* under the Equal Pay Act with respect to her future earnings.  A claim under the Equal Pay Act accrues each time an employee receives a paycheck paying him or her less than an employee of the opposite sex who performs equal work.  *Short v. Chertoff*, 526 F. Supp. 37, 42 (D. D.C. 2007).  Absent additional details about the precise terms

96

of the settlement agreement, the court is unwilling to assume that Rady's waiver of preexisting claims somehow constituted a prospective waiver of her substantive rights under the Equal Pay Act.[21]

As of May 2005, Rady was making $16.50 per hour.  (J.S. - Rady ¶ 24).  Rady previously made $16.00 per hour.  (*Id.* ¶ 20.)  In May 2006, her rate of pay was increased to $17.00 per hour.  (*Id.* ¶ 38.)  In his declaration, Blute stated that, in 2005 and 2006, the funeral directors at Brandt Funeral Home each received 3% raises because the payroll budget at Brandt Funeral Home increased by 3%.  (Defs.' App. Reply- Prise  Resp. at Tab 9 ¶ 7.)  Rady does not point to evidence which contradicts Blute's declaration.

The court already concluded that, for purposes of summary judgment, the relevant "establishment" is broad enough to include Hirsch Funeral Home, Brandt Funeral Home, Samson Funeral Home, Neill Funeral Home, Reese Funeral Home, Davis Funeral Home, Bartlett Funeral Home and Dorsey Funeral Home.  In an attempt to establish a prima facie case under the Equal Pay Act, Rady identifies male funeral directors at these funeral homes who were paid more than her.  (Rady Mem. Resp. 7-9.)  The evidence indicates that, during the relevant period of time, some male funeral directors were paid at a higher rate than Rady.  For instance, one male made $21.05 per hour while working as a funeral director at Dorsey Funeral Home in 2006.  (Pls.' J.A. at Tab 38.)  As of September 27, 2005, a male funeral director at Dorsey Funeral Home was paid at the rate of $20.25 per hour.  (*Id.*)  His rate of pay was increased to $21.06 per hour on May 1,

---

[21]Alderwoods produced a partially redacted copy of the settlement agreement which includes a handwritten indication that Rady was to receive an additional $50.00 per month to serve as a supervising funeral director at Samson Funeral Home.  (Defs.' App. Reply - Rady Resp. Defs.' Mot. Sum. J. at Tab 10.)  The settlement agreement, however, was executed more than a year after Alderwoods closed Samson Funeral Home.  (*Id.* at Tab 27 ¶ 6.)  The increase in Rady's pay appears to have been designed to compensate her for a  *past* pay disparity.

2006. (*Id.*)  Another male funeral director at Dorsey Funeral Home was making $16.75 per hour in 2005. (*Id.*)  His rate of pay was increased to $17.42 per hour on May 1, 2006. (*Id.*)  A male funeral director working at Neill Funeral Home was making $17.00 per hour as of May 1, 2005, and $17.85 per hour as of May 1, 2006. (*Id.*) Another male funeral director at Neill Funeral Home was making $17.41 per hour as of February 6, 2005. (*Id.*)  On July 27, 2006, just four days before Rady presented Alderwoods with her letter of resignation, a male was hired as a funeral director at Davis Funeral Home. (*Id.*)  His rate of pay was $19.00 per hour. (*Id.*)

Having presented evidence that some male funeral directors employed by Alderwoods were earning more than she was during the relevant period of time, Rady must also present evidence that these potential comparators were performing work that was equal to that performed by her. *Stanziale*, 200 F.3d at 107.  She failed to do so.  Instead of providing *evidence* to support her assertion that the male funeral directors identified by her performed equal work during the period of time at issue, Rady simply states in her brief that these individuals "were funeral directors with the *same job description* who performed work of substantially equal skill, effort, and responsibility, under similar working conditions." (Rady Mem. Resp. Defs.' Mot. 8.)  As the court already explained, however, the focus of the prima facie inquiry is on "actual job requirements and duties," not on "job classifications or titles." *Beck-Wilson*, 441 F.3d at 362. An assertion contained in a brief, absent a citation to the evidentiary record, does not constitute *evidence*. *Glover*, 980 F. Supp. at 444; *Passmore*, 979 F. Supp. at 1420.  As a plaintiff proceeding under the Equal Pay Act, Rady has the burden of showing that she performed work that was *equal* – and not merely *similar* – to that of her alleged comparators. *Walker*, 407 F. Supp. at 1374.  Because she did not make this showing, the burden does not shift to Alderwoods

to establish the applicability of one or more of the Equal Pay Act's affirmative defenses.[22]
*Stanziale*, 200 F.3d at 107.  Accordingly, Alderwoods is entitled to summary judgment with
respect to Rady's Equal Pay Act claim.[23]

## Conclusion

Because plaintiffs did not object to the dismissal of all claims against Hirsch Funeral
Home, Samson Funeral Home and Brandt Funeral Home, those claims will be dismissed.
Alderwoods' motion for summary judgment with respect to Rady's claims (*Document No. 111*)
will be granted in its entirety.  Alderwoods' motion for summary judgment with respect to Prise's
claims (*Document No. 107*) will be denied with respect to the retaliation claims under Title VII
and the PHRA and granted with respect to all other claims.  Prise's motion for partial summary
judgment (*Document No. 116*) will be denied.  There is a genuine issue of material fact about
whether Alderwoods retaliated against Prise for filing charges of discrimination with the EEOC

---

[22]Rady also points out in her brief that a male location manager, started to make $20.00 per hour on May 8, 2005, when he stepped down as Hirsch Funeral Home's location manager and resumed his previous duties as a funeral director.  (Rady's Mem. Resp. J.  9.)  The male's rate of pay was increased to $20.80 per hour on May 19, 2006.  (*Id.*) Because Rady did not provide evidence that she performed work that was equal, and not merely similar, to that of the male location manager who's pay was increased to $20.80 per hour on May 19, 2009, she cannot use that male as a comparator for purposes of her Equal Pay Act claim.

[23]Disparate pay that violates the Equal Pay Act can also violate Title VII.  *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 640 (2007) (*superceded by statute on other grounds*) (comparing the standards applicable under Title VII with those applicable under the Equal Pay Act).  When Rady sought leave to add her Equal Pay Act claim, she did not specifically seek leave to add parallel disparate pay claims under Title VII and the PHRA.  (Hr'g Tr. Mots. Nov. 17, 2008, 12.)  For this reason, Rady's disparate pay claims under Title VII and the PHRA are not properly before the court.  (Third Am. Compl. ¶¶ 89, 95.)   Even if Rady had properly asserted disparate pay claims under Title VII and the PHRA, Alderwoods would be entitled to summary judgment with respect to those claims.  Unlike Title VII and the PHRA, the Equal Pay Act does not require a plaintiff to establish that his or her employer engaged in "intentional discrimination."  *Ledbetter*, 550 U.S. at 640.  Because Rady cannot establish a violation of the Equal Pay Act, it follows that she cannot establish violations of Title VII and the PHRA under a disparate pay theory.

and the PHRC.  Thus, Prise may proceed to trial on her retaliation claims under Title VII and the

PHRA.  Third Am. Compl. at ¶¶ 72-73, 80-81.

By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Date: September 21, 2009